*Daniel Carter v. State of Maryland*
No. 54, September Term 2017

*James E. Bowie v. State of Maryland*
No. 55, September Term 2017

*Matthew Timothy McCullough v. State of Maryland*
No. 56, September Term 2017

**Criminal Procedure – Constitutional Law – Sentencing – Parole – Juvenile Offenders – Life Sentences.** The Eighth Amendment to the United States Constitution precludes a sentence of life without parole for a juvenile offender and requires that a sentence of a juvenile offender include a "meaningful opportunity for release based on demonstrated maturity and rehabilitation," unless the juvenile offender has been convicted of homicide and has been determined to be incorrigible in an individualized sentencing proceeding. A system of parole that confers unfettered discretion to deny parole to such an offender does not comply with the Eighth Amendment. The life sentences imposed on Daniel Carter, who had been convicted of homicide, and James Bowie, who had been convicted of non-homicide offenses, comply with the constitutional requirements because the Maryland law governing those sentences incorporates the Eighth Amendment standards. The statute and regulations governing parole in Maryland require the Parole Commission to take into account a variety of factors that include demonstrated maturity and rehabilitation in making recommendations to the Governor concerning the parole of juvenile offenders serving life sentences. An executive order issued by the Governor provides that the Governor will consider those same factors in deciding whether to parole such an inmate and will issue a written explanation of the decision.

**Criminal Procedure – Constitutional Law – Sentencing – Parole – Juvenile Offenders – Sentences for Terms of Years.** The Eighth Amendment to the United States Constitution precludes a sentence of life without parole for a juvenile offender who has not committed homicide. An aggregate sentence of 100 years, comprised of maximum sentences run consecutively for four assault convictions related to the same incident, under which the juvenile offender would become eligible for parole in 50 years, was equivalent to a sentence of life without parole. Accordingly, the defendant must be re-sentenced to a sentence that allows a "meaningful opportunity for release based on demonstrated maturity and rehabilitation."

Circuit Court for Baltimore City
Case No. 198265028

Circuit Court for Charles County
Case No. 08-K-96-000119

Circuit Court for Baltimore County
Case No. 03-K-04-001787

Argument: February 6, 2018

IN THE COURT OF APPEALS
OF MARYLAND

Docket Nos. 54, 55, 56
September Term, 2017

─────────────────────────────

DANIEL CARTER

V.

STATE OF MARYLAND

─────────────────────────────

JAMES E. BOWIE

V.

STATE OF MARYLAND

─────────────────────────────

MATTHEW TIMOTHY MCCULLOUGH

V.

STATE OF MARYLAND

─────────────────────────────

Barbera, C.J.
Greene
Adkins
McDonald
Watts
Hotten
Getty,
        JJ.

─────────────────────────────

Opinion by McDonald, J.
Barbera, C.J., Greene and Adkins, JJ., dissent in
Nos. 54 and 55;
Watts and Getty, JJ., dissent in No. 56.

─────────────────────────────

Filed: August 29, 2018

Pursuant to Maryland Uniform Electronic Legal Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Bessie Decker, Clerk
April 20, 2018

It has been said that "mercy without justice is the mother of dissolution; justice without mercy is cruelty."[1] A sentence of life in prison without parole may be just for certain adult offenders, but the Eighth Amendment's proscription against cruel and unusual punishments precludes that sentence for a juvenile offender unless the defendant is an incorrigible murderer. Although there need not be a guarantee of release on parole, a sentence imposed on a juvenile offender must provide "some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation."[2]

In this opinion, we consider three cases involving crimes that were committed when each Petitioner was a juvenile.[3] None of the sentences imposed in these cases was explicitly "life without parole." In two cases, the Petitioners were sentenced to life with the possibility of parole. In the third case, the Petitioner was sentenced to 100 years incarceration and will not be eligible for parole until he has served approximately 50 years in custody. Each Petitioner asserts that he is effectively serving a sentence of life without parole, because the laws governing parole in Maryland do not provide him with a "meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." They have each filed a motion to correct an illegal sentence.

---

[1] *See* Randy Lee, *Justice Benjamin Nathan Cardozo and his Two Most Important Questions: Reflections on the Choice of Tycho Brahe*, 34 Touro L. Rev. 237, 242 (2018) (quoting Thomas Aquinas).

[2] *Graham v. Florida*, 560 U.S. 48, 75 (2010).

[3] A fourth case, which was argued together with these cases, has been resolved on procedural grounds and is the subject of a separate opinion. *State v. Clements*, ___ Md. ___, No. 57 (Sept. Term 2017) (2018).

With respect to the two Petitioners serving life sentences, we hold that their sentences are legal as the laws governing parole of inmates serving life sentences in Maryland, including the parole statute, regulations, and a recent executive order adopted by the Governor, on their face allow a juvenile offender serving a life sentence a "meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation."[4] We express no opinion as to whether those laws have been, or will be, carried out legally, as that issue is not before us and may be litigated in the future. With respect to the Petitioner who is serving a 100-year sentence, we hold that the sentence is effectively a sentence of life without parole violative of the Eighth Amendment and that the Petitioner is entitled to be re-sentenced to a legal sentence.[5]

# I

## Background

As a predicate to explaining our decisions in these case, we first outline the constitutional limits on the punishment of juveniles recognized in recent Supreme Court decisions, then summarize the laws governing parole and executive clemency in Maryland, and finally describe the facts and procedural histories of the three cases before us.

---

[4] This holding is explained in Part II.A. of this opinion, which is joined by Judge Watts, Judge Hotten, and Judge Getty.

[5] This holding is explained in Part II.B. of this opinion, which is joined by Chief Judge Barbera, Judge Greene, Judge Adkins, and Judge Hotten.

### A.   *Constitutional Limits on the Punishment of Juvenile Offenders*

The Eighth Amendment to the United States Constitution prohibits "cruel and unusual punishments." That prohibition applies to the states through the Fourteenth Amendment. *Robinson v. California*, 370 U.S. 660, 666 (1962). The Maryland Constitution contains similar proscriptions. *See* Maryland Declaration of Rights, Article 16 ("no Law to inflict cruel and unusual pains and penalties ought to be made in any case, or at any time, hereafter."), Article 25 ("cruel or unusual punishment [ought not to be] inflicted, by the Courts of Law").[6]

### 1.   Recent Supreme Court Decisions Applicable to Juvenile Offenders

During the past 15 years, the Supreme Court has issued a series of decisions in which it held that the Eighth Amendment to the federal Constitution places limits on the sentencing of juvenile offenders that do not apply to the sentencing of adult offenders. In particular, the Court has held that the Eighth Amendment bars imposition of the death penalty and severely restricts the imposition of a sentence of life without parole.

> *Juvenile offenders may not be sentenced to the death penalty*
> *(Roper v. Simmons)*

In 2005, the Supreme Court held that the Eighth Amendment's proscription against "cruel and unusual punishments" prohibits the imposition of the death penalty against a

---

[6] These provisions of the Maryland Declaration of Rights have usually been construed to provide the same protection as the Eighth Amendment, although this Court has acknowledged that there is some textual support for finding greater protection in the Maryland provisions. *Thomas v. State*, 333 Md. 84, 103 n.5 (1993); *see generally* Dan A. Friedman, The Maryland State Constitution: A Reference Guide (2006) at pp. 24-25, 36.

defendant who committed the offense as a juvenile – *i.e.*, when the defendant was less than 18 years old. *Roper v. Simmons*, 543 U.S. 551 (2005).

In its opinion, the Court first identified a developing consensus among the states that suggested that "the evolving standards of decency" were against the imposition of the death penalty when the offender was under the age of 18. 543 U.S. at 561, 564-75. The Court found the basis for this consensus in well accepted differences between juveniles and adults. It stated that the death penalty is reserved for the worst offenders, and that several characteristics of juveniles make it difficult to reliably say whether a juvenile offender belongs in that category.

The Court identified the following characteristics of juveniles: (1) juveniles lack maturity, leading to "an underdeveloped sense of responsibility," as well as "impetuous and ill-considered actions and decisions"; (2) juveniles are more vulnerable or susceptible to negative influences and peer pressure due, in part, to juveniles having less control over their environment or freedom "to extricate themselves from a criminogenic setting"; (3) the personality of a juvenile is not as well formed as that of an adult, and their traits are more transitory and less fixed. 543 U.S. at 569-70 (internal quotations and citations omitted). In light of these characteristics, the usual sentencing justifications for the death penalty – retribution and deterrence – did not provide adequate justification for imposing the death penalty against juvenile offenders. *Id.* at 571-72.

The Court concluded that the differences between juveniles and adults "are too marked and well understood to risk allowing a youthful person to receive the death penalty despite insufficient culpability." The confluence of these factors led the Supreme Court to

4

adopt a categorical prohibition against the imposition of the death penalty against juvenile offenders. 543 U.S. at 572-73.

> *Juvenile non-homicide offenders may not be sentenced to life without parole*
> (*Graham v. Florida*)

Five years later, the Supreme Court extended the reasoning of *Roper* to overturn the sentence of a juvenile offender sentenced to life imprisonment without parole.[7] *Graham v. Florida*, 560 U.S. 48 (2010). In contrast to its decision in *Roper*, the Court did not conclude that this punishment was unconstitutional for all juvenile offenders. Rather, the Court drew a distinction between juveniles convicted of homicide and those who had been convicted of other offenses, and held that a sentence of life without parole violates the Eighth Amendment when imposed on a juvenile offender who did not commit homicide. 560 U.S. at 82.

The Court first considered whether there were "indicia of a national consensus" on the subject. After reviewing various statistics on state laws concerning juvenile sentencing and actual practice, the Court concluded that "life without parole sentences for juveniles convicted of nonhomicide crimes is as rare as other sentencing practices found to be cruel and unusual." 560 U.S. at 66. The Court then considered whether the challenged practice serves legitimate penological goals. The Court reiterated its analysis in *Roper* that juveniles have "lessened culpability" in comparison to adults. It also distinguished

---

[7] As a result of a probation violation, the defendant had been sentenced to the maximum sentence of life imprisonment. Because parole had been abolished in Florida as of that time, the sentence amounted to life imprisonment without parole. 560 U.S. at 57.

between homicide and non-homicide offenders, recognizing that "defendants who do not kill, intend to kill, or foresee that life will be taken are categorically less deserving of the most serious form of punishment than are murderers." *Id.* at 69. Accordingly, "when compared to an adult murderer, a juvenile offender who did not kill or intend to kill has a twice diminished moral culpability." *Id.* The Court also noted that life without parole is an "especially harsh" sentence for a juvenile defendant as it condemns the juvenile to a larger percentage of the individual's life in prison than a much older individual who receives the same sentence. *Id.* at 70.

The Court concluded that, although legislatures are not required to adopt any particular penological theory, no theory could justify a sentence of life without parole for a juvenile offender who had not committed murder. 560 U.S. at 71. The Court considered the common purposes of sentencing schemes: retribution, deterrence, incapacitation, and rehabilitation. Retribution was insufficient because "the heart of the retribution rationale is that a criminal sentence must be directly related to the personal culpability of the criminal offender[,]" and that "the case for retribution is not as strong with a minor as with an adult." *Id.* (internal citations and quotation marks omitted). Deterrence could not justify the sentence because the characteristics that make juveniles more likely to make bad decisions also make them less likely to consider the possibility of punishment, which is a prerequisite to a deterrent effect. *Id.* at 72. Incapacitation could not support the sentence because of the difficulty in determining whether a juvenile defendant is incorrigible at the time of sentencing – *i.e.,* "to differentiate between the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects

6

irreparable corruption." *Id.* at 72-73 (quoting *Roper*). Finally, rehabilitation could not justify the sentence because it denies the prisoner the right to "reenter the community [based on] an irrevocable judgment about that person's value and place in society." *Id.* at 74.

Importantly, the Court stressed that "[a] State is not required to guarantee eventual freedom" because some "who commit truly horrifying crimes as juveniles may turn out to be irredeemable, and thus deserving of incarceration for the duration of their lives." 560 U.S. at 75. However, a State must "give [juvenile] defendants … some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." *Id.* The Court did not purport to dictate how a state must provide that opportunity, stating that "[i]t is for the State, in the first instance, to explore the means and mechanisms for compliance." *Id.*

### *Limitation on sentencing juvenile homicide offenders to life without parole* (*Miller v. Alabama*)

The decision in *Graham* was explicitly limited to juveniles who had committed offenses other than homicide. Two years after *Graham*, the Supreme Court applied some of the same reasoning to hold that the Eighth Amendment prohibits a state sentencing scheme that mandates a sentence of life without parole for a juvenile offender who had been convicted of homicide. *Miller v. Alabama*, 567 U.S. 460 (2012). That decision consolidated two cases in which juvenile offenders had participated with others in offenses that resulted in death, were tried as adults, and, upon conviction, received mandatory life without parole sentences under state law.

7

*Miller* was not simply an extension of *Graham,* but rather a synthesis of two distinct principles. The first principle is that "children are constitutionally different from adults for purposes of sentencing." 567 U.S. at 471. The second principle is that individualized sentencing is required before imposing harsh and immutable sentences. *Id.* at 475. "[T]he confluence of these two lines of precedent leads to the conclusion that mandatory life-without-parole sentences for juveniles violate the Eighth Amendment." *Id*. at 470.

The Court in *Miller* did not hold that the Eighth Amendment categorically bars a particular sentence for juveniles, as it did in *Graham* and *Roper*. 567 U.S. at 479. Instead, it required "tak[ing] into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." *Id.* at 480.

> *Limitations on life without parole for juvenile offenders apply retroactively* (*Montgomery v. Louisiana*)

More recently, the Court considered whether its decision in *Miller* applied retroactively – *i.e.*, to convictions that were final before that decision was rendered. *Montgomery v. Louisiana*, 136 S.Ct. 718 (2016). In that case, an inmate who had been convicted of committing a murder in 1963 while 17 years old and had been sentenced to life without parole sought postconviction relief in state court on the ground that *Miller* had rendered his sentence unconstitutional. The Supreme Court first had to resolve whether *Miller* should be applied retroactively in that context and concluded that it should.[8]

---

[8] The Court applied the plurality opinion in *Teague v. Lane*, 489 U.S. 288 (1989), which set forth a framework for considering retroactivity in cases under federal collateral review. Under that framework, a case establishing a new rule should not be applied retroactively on collateral review unless the new rule is either a substantive rule of constitutional law or a "watershed rule of criminal procedure." 136 S.Ct. at 728 (citations

Accordingly, convictions that were already final were subject to the principle that a sentence of life without parole is prohibited by the Eighth Amendment "for all but the rarest of juvenile offenders, whose crimes reflect permanent incorrigibility." 136 S.Ct. at 734.

The Court then discussed how a postconviction court might resolve a claim under *Miller*. The Court stated that giving *Miller* retroactive effect did not require a state to relitigate the sentence, much less the conviction, in a case in which a juvenile homicide offender received a sentence of life without parole. The Court stated that compliance with *Miller* could be accomplished either by re-sentencing the defendant or by permitting that defendant to be considered for parole. 136 S.Ct. at 736. The Court reiterated that "prisoners who have shown an inability to reform will continue to serve life sentences." *Id.* However, "prisoners like Montgomery must be given the opportunity to show their

---

and quotations omitted). The Court defined substantive rules as those placing certain laws and punishments beyond the State's power to impose, whereas procedural rules enhance the accuracy of a conviction or the manner of determining a defendant's culpability. *Id.* at 729-30. The Court held "that when a new substantive rule of constitutional law controls the outcome of a case, the Constitution requires state collateral review courts to give retroactive effect to that rule." *Id*. at 729.

There appeared to be no question that the holding in *Graham* established a substantive rule to be given retroactive effect. *See* 136 S.Ct. at 734. A more difficult question was whether the holding in *Miller* was categorized as a substantive rule or a procedural one. In *Montgomery,* the Court held that the decision included both. *Id.* at 732-36. Although *Miller* discussed a procedural rule "to separate those juveniles who may be sentenced to life without parole from those who may not[,]" this was to "give[] effect to *Miller's* substantive holding that life without parole is an excessive sentence for children whose crimes reflect transient immaturity." *Id.* at 735. Accordingly, a state court is to apply *Miller* retroactively on collateral review.

crime did not reflect irreparable corruption; and, if it did not, their hope for some years of life outside prison walls must be restored." *Id.* at 736-37.

2.      Distinguishing a parole system from executive clemency

In its trilogy of recent decisions concerning juvenile offenders who had received sentences of life without parole, the Supreme Court did not explicitly address whether a state is required to maintain a traditional parole system to provide the "meaningful opportunity for release" required by the Eighth Amendment for most juvenile offenders sentenced to life imprisonment. Indeed, the Court stated that it was the prerogative of the states "to explore the means and mechanisms for compliance." *Graham*, 560 U.S. at 75.[9] However, in recounting two earlier decisions not involving juvenile offenders, the Court appeared to accept the proposition that the availability of executive clemency would not satisfy the requirement of a "meaningful opportunity to obtain release based on

---

[9] Recently, the Supreme Court reviewed a decision concerning whether the possibility of release under a state's "geriatric release" statute (in a state that had abolished parole) would comply with *Graham*. *Virginia v. LeBlanc*, 137 S.Ct. 1726 (2017) (per curiam). However, the procedural posture of that case – deferential collateral review of a state court decision under the federal Antiterrorism and Effective Death Penalty Act ("AEDPA") – means that the case provides limited guidance for our purposes. In *LeBlanc*, a state court, relying on a decision of its supreme court, had rejected an argument that the possibility of geriatric release failed to satisfy the Eighth Amendment. The Fourth Circuit, however, affirmed a grant of postconviction relief citing *Graham*. The Supreme Court summarily reversed, in a *per curiam* opinion. The Supreme Court explicitly did not decide whether geriatric release would satisfy the Eighth Amendment, but only that the Fourth Circuit had not accorded the state court decision on the issue the deference due under AEDPA and that the state court decision was "not objectively unreasonable." Justice Ginsburg concurred separately, stating her understanding that the state parole board was required under state law to consider "the normal parole factors, including rehabilitation and maturity." 137 S.Ct. at 1730. Thus, while such a geriatric release program might satisfy *Graham*, the Court has not reached such a holding.

10

demonstrated maturity and rehabilitation." *Id.* at 69-70 (discussing *Rummel v. Estelle*, 445 U.S. 263 (1980) and *Solem v. Helm*, 463 U.S. 277 (1983)).

In *Rummel*, the defendant was convicted of obtaining $120.75 under false pretenses and sentenced to life imprisonment under a Texas recidivist statute – a sentence for which parole was available. The Supreme Court rejected the defendant's Eighth Amendment challenge to that sentence because, among other things, his actual sentence could be shorter than life in light of the potential for release on parole.

Three years later, in *Solem*, the Court drew a distinction between the availability of parole and of executive clemency. In *Solem*, the defendant was convicted for writing a bad check for $100 and sentenced to life imprisonment under a South Dakota recidivist statute. Under that sentence, the defendant was not eligible for parole consideration, but executive clemency was available. 463 U.S. at 281-82. The defendant sought habeas relief and challenged the sentence as contrary to the Eighth Amendment. South Dakota argued that its commutation procedure was equivalent to parole under the Texas scheme in *Rummel*, and the federal district court agreed. The Eighth Circuit reversed on the ground that the sentence was grossly disproportionate to the nature of the offense in violation of the Eighth Amendment, distinguishing *Rummel*.

The Supreme Court agreed with the Eighth Circuit that the case was distinguishable from *Rummel*. The Court stated that, unlike commutation, release by parole is "the normal expectation in the vast majority of cases" if the inmate demonstrates good behavior. *Solem* 463 U.S. at 300. The timing, standards, and procedures for parole are specified by law, making it "possible to predict, at least to some extent, when parole might be granted." *Id.*

11

at 300-1 (internal citations omitted).  On the other hand, commutation is an "*ad hoc*

exercise of clemency … without any reference to standards."  *Id.* at 301 (internal citation

omitted).

The Court's reasoning in *Solem* did not rest on a categorical distinction between

parole and commutation, but examined how the two mechanisms for release of an inmate

operated in practice.  It characterized the decision in *Rummel* as "not rely[ing] simply on

the existence of some system of parole[,]" but rather "the provisions of the system

presented," including a liberal policy of good time credit.  *Solem*, 463 U.S. at 301-2 (citing

*Rummel,* 445 U.S. at 280).    South Dakota's system was not equivalent because

"commutation is more difficult to obtain than parole" as illustrated by the fact that no life

sentence had been commuted in eight years.  *Id.* at 302.  By contrast, parole had been

"granted regularly" during the same time period.  *Id.*  The Court described South Dakota's

executive clemency system as "nothing more than a hope" that would be "little different

from the possibility of executive clemency that exists in every case[.]"  *Id.* at 303.  The

Court declined to recognize executive clemency in South Dakota as comparable to parole

because it "would make judicial review under the Eighth Amendment meaningless."

Earlier Supreme Court decisions made a similar distinction between parole and

executive clemency in other contexts.  "Rather than being an *ad hoc* exercise of clemency,

parole is an established variation on imprisonment of convicted criminals.  Its purpose is

to help individuals reintegrate into society as constructive individuals as soon as they are

able, without being confined for the full term of the sentence imposed."  *Morrissey v.*

*Brewer*, 408 U.S. 471, 477 (1972).  The amount of discretion the decision maker has is a

recurring theme in Supreme Court cases distinguishing parole from other forms of early release. *Connecticut Board of Pardons v. Dumschat*, 452 U.S. 458, 466 (1981) (recognizing "unfettered discretion" in commutation proceeding "contrasts dramatically" with statutory criteria in parole).

Reading these cases together provides some guidance for distinguishing a release mechanism or process that complies with *Graham* and *Miller* from one that does not, regardless of the label attached to the mechanism or process. In particular, the mechanism or process must have criteria for the exercise of the discretion of the decision makers. As a result, an inmate can conform his or her behavior to those criteria in a way that will materially improve the inmate's expected date of release. Under such a process, early release is not an exception for those inmates, but is expected in a large number, if not the majority, of cases.

3. Summary

From our excursion through the Supreme Court's Eighth Amendment cases, we derive the following principles concerning the constitutional constraints on life sentences for juvenile offenders:

- With respect to juvenile offenders convicted of offenses other than homicide, the Eighth Amendment categorically bars a sentence of life in prison without the possibility of future release from custody. *Graham*.

- With respect to juvenile offenders convicted of homicide:

  ➢ there must be an individualized sentencing process that takes account of the offender's youth;

13

➤ the defendant may be sentenced to imprisonment without the possibility of future release only if the court determines that the defendant is incorrigible. *Miller; Montgomery.*

- For all juvenile offenders who are convicted of non-homicide offenses and the vast majority who are convicted of homicide, there must be a "meaningful opportunity to obtain release" from custody based on "demonstrated maturity and rehabilitation." *Graham; Miller; Montgomery.*

- It is up to the states in the first instance to devise the means and mechanisms for providing such a meaningful opportunity. *Graham.*

- A parole system that takes into account the offender's youth at the time of the offense and demonstrated rehabilitation provides such a meaningful opportunity. *Graham; Miller.*

- There is no constitutional requirement that a state have a parole system *per se*, so long as the state provides a meaningful opportunity for release based on demonstrated maturity and rehabilitation. *Graham.*

- An executive clemency system that leaves the decision on release of an offender to the unfettered discretion of a public official or entity does not provide such a meaningful opportunity. *Rummel; Solem.*

- While a state's criminal justice system must provide such a meaningful opportunity, it need not guarantee release. *Graham.*

## B. *Parole and Executive Clemency in Maryland*

The Maryland Constitution provides that "[t]he General Assembly of Maryland shall have the power to provide by suitable general enactment … for the release upon parole in whatever manner the General Assembly may prescribe, of convicts imprisoned under sentence for crimes." Maryland Constitution, Article III, §60(c). The General Assembly has exercised that constitutional authority by creating the Maryland Parole Commission

and enacting statutes governing the process by which an inmate can seek release on parole. *See* Maryland Code, Correctional Services Article ("CS"), §7-101 *et seq*. Pursuant to legislative direction, the Parole Commission has adopted regulations governing its policies and activities with respect to parole. CS §7-207; COMAR 12.08.01.

*Eligibility for Parole*

Parole is the conditional release of an inmate from confinement pursuant to a decision or recommendation of the Parole Commission. *See* CS §7-101(i); §7-301 *et seq*.[10] As a general rule, an inmate who is serving a sentence longer than six months becomes eligible for parole consideration after serving one-fourth of the inmate's aggregate sentence. CS §7-301(a); COMAR 12.08.01.17A. There are a number of exceptions to that general rule, two of which are pertinent to this opinion.

First, if the inmate was convicted of a violent crime committed after October 1, 1994, the inmate is not eligible for parole consideration until the inmate has served one-half of the aggregate sentence for the violent crimes,[11] or one-fourth of the aggregate sentence, whichever is greater. CS §7-301(c)(1)(i); COMAR 12.08.01.17A(3).

Second, an inmate sentenced to life imprisonment with the possibility of parole is not eligible for parole consideration until the inmate has served 15 years (or the equivalent

---

[10] Parole is distinguished from release on mandatory supervision, which involves the conditional release of the inmate by operation of law by the Division of Correction as a result of the application of diminution credits against the inmate's sentence. CS §7-101(g); CS §7-501 *et seq*; *see also* 86 *Opinions of the Attorney General* 226, 226-28 (2001).

[11] "Violent crime" is defined in CS §7-101(m) and includes, among other offenses, first-degree assault. *See* Maryland Code, Criminal Law Article, §14-101(a)(20).

of 15 years taking into account diminution credits). CS §7-301(d)(1); COMAR 12.08.01.17A(7). In certain cases in which the inmate was convicted of first-degree murder, the inmate may not be eligible for parole until the inmate has served 25 years (taking into account diminution credits). CS §7-301(d)(2); COMAR 12.08.01.17A(7)(b).

*The Decision on Parole*

An eligible prisoner is to receive a parole hearing unless, following a review, the Parole Commission "determines that no useful purpose would be served by a hearing." COMAR 12.08.01.17A(1), (3). Hearings may be conducted by a hearing examiner employed by the Parole Commission or by a Commissioner, except that only Commissioners may conduct hearings in certain enumerated cases. CS §§7-204, 7-205. For an inmate serving a life sentence, two Commissioners conduct the initial hearing. COMAR 12.08.01.17A(7)(f).

As a general rule, the Parole Commission "has the exclusive power" to authorize the release of an inmate on parole. CS §7-205(a)(1). However, the Parole Commission does not have the authority to grant parole directly to an inmate serving a life sentence. In a feature that distinguishes the parole system in Maryland from that in most other states,[12]

---

[12] Only two other states, Oklahoma and California, have a system that includes the governor in decisions to parole inmates serving life sentences. Kate Hatheway, *Creating a Meaningful Opportunity for Review: Challenging the Politicization of Parole for Life-Sentenced Prisoners,* 54 Am.Crim.L.Rev. 601, 605 (2017). Texas used to have such a system, but removed the Governor from parole decisions in 1983. Jamie Gonzales, *Treating Adults like Children: Texas Juvenile Parole Hearings and the Texas Board of Pardons and Paroles*, 17 Tex.Tech Admin.L.J. 107, 115 (2015).

the Governor plays a role in cases where the inmate is serving a life sentence. CS §7-206(3)(i); CS §7-301(d)(4)-(5).

If both Commissioners who conduct the initial hearing agree that an inmate serving a life sentence is suitable for parole, the case is considered by the entire Parole Commission. COMAR 12.08.01.17A(7)(f), 23A. If the Parole Commission agrees by majority vote to recommend parole, it submits the recommendation to the Governor. CS §7-301(d)(5)(i); COMAR 12.08.01.17A(7)(g). The Governor may approve or disapprove the Parole Commission's recommendation, but if the Governor does not do either within 180 days of receipt of the recommendation and the inmate has already served 25 years, the Parole Commission's recommendation becomes the effective decision on parole. CS §7-301(d)(5)(ii-iii).[13]

*Parole Considerations*

To determine whether an inmate is suitable for parole, the Parole Commission is to consider a number of factors, including the circumstances of the offense; the "physical, mental, and moral qualifications" of the inmate; the progress of the inmate during confinement; any drug or alcohol evaluation of the inmate (including the inmate's amenability to treatment); whether, if released, the inmate will be law-abiding; an updated victim impact statement and any victim-related testimony; any recommendations of the

---

[13] The General Assembly added this 180-day "shot clock" to the statute in 2011. Chapter 623, Laws of Maryland 2011.

sentencing judge; and whether there is a substantial risk that the inmate will not abide by the conditions of parole. CS §7-305; COMAR 12.08.01.18A(1)-(2).

If the inmate was a juvenile at the time of the offense, the Parole Commission's regulations require consideration of the following additional factors:

(a)    age at the time the crime was committed;

(b)    the individual's level of maturity and sense of responsibility at the time of [sic] the crime was committed;

(c)    whether influence or pressure from other individuals contributed to the commission of the crime;

(d)    whether the prisoner's character developed since the time of the crime in a manner that indicates the prisoner will comply with the conditions of release;

(e)    the home environment and family relationships at the time the crime was committed;

(f)    the individual's educational background and achievement at the time the crime was committed; and

(g)    other factors or circumstances unique to prisoners who committed crimes at the time the individual was a juvenile that the Commissioner determines to be relevant.

COMAR 12.08.01.18A(3).[14]

Under the statute, neither the general considerations governing all decisions of the Parole Commission, nor the special considerations relating to the juvenile offenders, apply

---

[14] The Parole Commission adopted these additional factors for the parole consideration of juvenile offenders in amendments to its regulations effective October 24, 2016. 43:21 Md. Reg. 1168. They were apparently adopted in view of recent Supreme Court decisions concerning parole of juvenile offenders. *See* Part I.A. of this opinion.

to the Governor's decision to approve or disapprove parole for an inmate serving a life sentence. However, the Governor recently issued an executive order setting forth the factors that the Governor is to consider in approving or disapproving parole for an inmate serving a life sentence and providing for a written decision by the Governor concerning the application of those factors.

*2018 Executive Order concerning Governor's Decisionmaking*

On February 9, 2018, the Governor issued an executive order that formally set forth how he would exercise his discretion under CS §7-301(d)(4)-(5) to approve or disapprove a recommendation from the Parole Commission for parole of an inmate serving a life sentence. *See* 45:5 Md. Reg. 261 (March 2, 2018), *codified at* COMAR 01.01.2018.06 ("the 2018 Executive Order").[15]

The 2018 Executive Order provides that "the Governor shall assess and consider … the same factors and information assessed by the … Parole Commission as provided by the … Parole Commission's governing statutes and regulations," as well as "other lawful factors deemed relevant by the Governor." COMAR 01.01.2018.06A. In particular, with respect to a juvenile offender serving a life sentence, the 2018 Executive Order provides that the Governor will specifically consider:

- the juvenile offender's age at the time the crime was committed
- the lesser culpability of juvenile offenders as compared to adult offenders

---

[15] The 2018 Executive Order was issued after oral argument in these cases. The Court permitted the parties to submit supplemental briefs concerning the effect of the executive order.

- the degree to which the juvenile offender has demonstrated maturity since the commission of the crime

- the degree to which the juvenile offender has demonstrated rehabilitation since the commission of the crime

COMAR 01.01.2018.06C(1).[16]

The 2018 Executive Order provides that, if the Governor disapproves a recommendation for parole, the Governor will provide a written decision confirming that the factors described in the executive order were considered and, in the case of a juvenile offender, stating the reasons for disapproving the Commission's recommendation. COMAR 01.01.2018.06B, C(2).[17]

*Case Law concerning Governor's Role in Parole of Inmates Serving Life Sentences*

More than 20 years ago, a previous Governor articulated a very different policy, although not in the form of an executive order, concerning the exercise of gubernatorial discretion to grant parole to inmates serving life sentences. In 1995, in the course of denying parole to several inmates serving life sentences, Governor Parris Glendening declared that he would not approve the parole of any prisoner serving a life sentence unless the inmate was very old or terminally ill. (Under the statute at that time, the Governor's

---

[16] Like the Parole Commission's regulations, the 2018 Executive Order was apparently issued, at least in part, in recognition of recent Supreme Court decisions concerning parole of juvenile offenders.

[17] The 2018 Executive Order provides that it is not to be construed to apply retroactively to any decision of the Governor made prior to the promulgation of the executive order. COMAR 01.01.2018.06D. No decision of the Governor made prior to adoption of the 2018 Executive Order is at issue in these cases.

affirmative approval was an absolute prerequisite for parole of an inmate serving a life sentence; gubernatorial inaction could not result in parole). As a result, the Division of Correction and the Parole Commission halted their consideration of parole recommendations for inmates serving life sentences. The Governor's announcement sparked constitutional challenges to the policy and to the Maryland parole system.

Several inmates challenged the Glendening policy as a violation of the *ex post facto* clause of the State and federal Constitutions – in particular, they contended that the Governor's policy had converted a life sentence with the possibility of parole to a life sentence without parole. *See Lomax v. Warden*, 356 Md. 569 (1999); *State v. Kanaras*, 357 Md. 170 (1999); *Griggs v. Maryland*, 263 F.3d 355 (4th Cir. 2001); *Knox v. Lanham*, 895 F. Supp. 750 (D. Md. 1995), *aff'd*, 76 F.3d 377 (4th Cir. 1996).

In *Lomax,* this Court affirmed a circuit court's denial of *habeas corpus* relief and held that the Glendening policy did not violate the *ex post facto* clause. 356 Md. at 576-77. The Court reasoned that the *ex post facto* clause does not apply to parole guidelines that do not have the force of law, but are simply "policies" that could be changed whenever the Governor wished to do so.[18] *Id*. The Court noted that "the General Assembly has not set forth any factors to guide the Governor's exercise of discretion in approving or disapproving parole recommendations." *Id*. at 581. The standards set out by the

---

[18] By contrast, the United States District Court held that changes in the policies of the Division of Correction and the Parole Commission with respect to inmates serving life sentences that effectively eliminated the possibility of a parole recommendation to the Governor *did* violate the constitutional prohibition against *ex post facto* laws. *Knox, supra*.

21

Legislature for parole decisions in CS §7-305 apply to the Parole Commission, not the Governor. "Accordingly, the Governor is free to employ whatever guidelines he desires in exercising his discretion, except for guidelines that are constitutionally impermissible." *Id.* at 578 n.2.

In *Kanaras*, the Court reiterated its holding concerning the *ex post facto* clause and also held that a motion to correct an illegal sentence was not the appropriate procedural vehicle to challenge the alleged failure of the Parole Commission and the Commissioner of Correction to exercise their discretion as to whether to recommend parole. *Kanaras*, 357 Md. at 185. Although the Court recognized that some of the actions of the Parole Commission and Commissioner of Correction were illegal, that illegality "did not inhere in Kanaras's sentence" and was "subject to correction through a proper proceeding, such as a declaratory judgment action, a mandamus action, or a habeas corpus proceeding." *Id.* at 185. The Court noted that the United States District Court in *Knox* had already ordered the Parole Commission and the Commissioner of Correction to carry out their duties under State law to make recommendations to the Governor concerning parole of inmates serving life sentences.

Governor Glendening left office in 2003, and although his successors did not announce a similar explicit policy, it is undisputed that prisoners serving life sentences have rarely been paroled in the intervening decades. Recent legal developments have suggested that parole of inmates serving life sentences will no longer be blocked by such a policy. In 2011, the Legislature amended the statute to provide that gubernatorial inaction in the face of a favorable parole recommendation would not block release of certain inmates

serving life sentences.  *See* footnote 13, above.  As noted above, in an explicit reversal of the Glendening policy, the 2018 Executive Order states that the Governor will give consideration to favorable parole recommendations with respect to inmates serving life sentences.

*Executive Clemency under the Maryland Constitution*

Distinct from the Governor's role in the parole of inmates serving life sentences, the Maryland Constitution confers the independent power of executive clemency on the Governor.  In particular, it provides that the Governor "shall have the power to grant reprieves and pardons, except in cases of impeachment, and in cases in which he is prohibited by other Articles of this Constitution; … and before granting a … pardon, he shall give notice, in one or more newspapers, of the application made for it, and of the day on, or after which, his decision will be given; and in every case, in which he exercises this power, he shall report to either Branch of the Legislature, whenever required, the petitions, recommendations and reasons, which influenced his decision."  Maryland Constitution, Article II, §20; *see also* CS §7-601 *et seq.*[19]  While the Constitution authorizes the

---

[19] The Legislature has elaborated on the Governor's constitutional pardon power:

> On giving the notice required by the Maryland Constitution, the Governor may:
>
> (1)    change a sentence of death into a sentence of life without the possibility of parole;
>
> (2)    pardon an individual convicted of a crime subject to any conditions the Governor requires; or

Governor to grant pardons and reprieves of sentences, it does not provide criteria as to when that power should be exercised.

## C. *Facts and Proceedings*

The question raised in each of these three consolidated appeals concerns sentences imposed on juvenile offenders that theoretically carry the possibility of parole but, the Petitioners' argument goes, are functionally equivalent to life without parole sentences, and therefore contrary to the recent Supreme Court guidance. These cases present three permutations: (1) a homicide case in which the defendant received a sentence of life imprisonment; (2) a non-homicide case in which the defendant received a sentence of life imprisonment; and (3) a non-homicide case involving multiple offenses in which the defendant received an aggregate sentence of 100 years imprisonment.

### 1. Daniel Carter

*Convicted of homicide and sentenced to life with eligibility for parole*

Daniel Carter was 15 years old in 1998 when he committed the offenses for which he is currently imprisoned. Those offenses all related to the fatal shooting of another man. On September 16, 1999, a jury in the Circuit Court for Baltimore City found Mr. Carter guilty of first-degree murder, use of a handgun in a crime of violence, and possession of a handgun.

---

(3)     remit any part of a sentence of imprisonment subject to any conditions the Governor requires, without the remission operating as a full pardon.

CS §7-601(a).

He was sentenced on November 9, 1999. The State recommended a life sentence with all but 50 years suspended for the murder, and 20 years for the handgun use charge. (The State indicated that it did not object to running the sentence for the handgun charge concurrently with the sentence for the murder charge.) Mr. Carter's counsel asked that the court suspend a significant portion of the sentence, citing his youth, unstable home life, and limited capacity for understanding. In allocution, Mr. Carter denied committing the murder. The Circuit Court stated that it was "not satisfied that [Mr. Carter] would be anything other than a detriment and a danger to other people on the street[,]" and sentenced Mr. Carter to a life sentence for the murder with a consecutive 20 year term for the handgun charge.

We understand that Mr. Carter will become eligible for parole after serving 25 years (with allowance for diminution credits), as a result of his consecutive sentences for homicide (eligible after serving 15 years) and for the handgun charge, a violent crime (eligible after serving one-half the sentence – that is, 10 years). CS §7-301(d)(1); CS §7-301(c)(1)(ii). We were advised by his counsel at oral argument that it is anticipated that he will have a parole hearing sometime later this year or next year.

On September 28, 2015, Mr. Carter filed a *pro se* motion under Maryland Rule 4-345 to correct an illegal sentence. The motion relied primarily on *Miller*, arguing that the sentencing judge should have considered Mr. Carter's youth, intellectual and psychological disabilities, and social background. In addition, Mr. Carter highlighted several accomplishments during his incarceration, which he said demonstrated that he was amenable to rehabilitation. The Circuit Court denied Mr. Carter's motion. In its written

25

order, the court noted that, unlike the situation in *Miller*, Mr. Carter had not been sentenced to life without parole and therefore will eventually be eligible for parole consideration – a decision it felt was "properly left to the executive branch."

Mr. Carter sought review in the Court of Special Appeals. Mr. Carter argued that, in light of Governor Glendening's stated policy,[20] his sentence was functionally one of life without the possibility of parole. In an unreported opinion dated August 11, 2017, the Court of Special Appeals rejected that argument and dismissed the appeal as premature. The intermediate appellate court reasoned that Mr. Carter was not yet eligible for parole, that the Parole Commission had not yet made a recommendation to the Governor, that the Governor had not yet disapproved such a recommendation, and accordingly, that Mr. Carter had suffered no legally cognizable harm under the recent Eighth Amendment case law. The court also held that Mr. Carter lacked standing to argue that Maryland's parole system is unconstitutional as applied to all juvenile offenders serving life sentences.

Mr. Carter petitioned this Court for a writ of *certiorari*, which we granted.

2.  James Bowie

*Convicted of non-homicide offenses and sentenced to life with eligibility for parole*

James Bowie was 17 years and 11 months old when he committed the offenses for which he is currently imprisoned. In February 1996, a grand jury in the Circuit Court for Charles County charged him with attempted first-degree murder, attempted second-degree murder, robbery with a deadly weapon, and related counts all arising from the same

---

[20] This filing preceded the recently-issued 2018 Executive Order.

incident.  Pursuant to an agreement with the State, on October 7, 1996, he pled not guilty, waived trial by jury, and submitted to a bench trial based on a stipulation of facts which included an understanding that the judge could consider evidence that had been introduced at the trial of his co-defendant.

The evidence demonstrated that, on December 28, 1995, Mr. Bowie and two friends, after a day of drinking alcohol and smoking crack cocaine, went to the home of a 67-year old waterman at the suggestion of one of the friends.  Mr. Bowie and the friend who had selected the victim entered the house to rob the waterman.  The friend sprayed the victim with mace and Mr. Bowie repeatedly hit the waterman in the head with a baseball bat, fracturing the man's skull.  The man survived.  Mr. Bowie and his friend stole $500 in cash, which they used to buy more cocaine.

At the trial on October 7, 1996, the court found Mr. Bowie guilty of attempted first-degree murder, attempted second-degree murder, and robbery with a deadly weapon.  Sentencing took place on January 21, 1997.  At the sentencing,[21] the State emphasized the severity of the crime and how close the victim had come to dying.  Defense counsel outlined Mr. Bowie's family history, which was marked by his parents' substance abuse, divorce, and abandonment of Mr. Bowie.  Counsel also described Mr. Bowie's own resort to substance abuse at a young age, and attributed Mr. Bowie's poor judgment in part to his

---

[21] At the sentencing hearing the court considered whether Mr. Bowie should have been transferred to juvenile court.  The court concluded that a transfer would not be appropriate because the juvenile court would have lost jurisdiction over Mr. Bowie after two years.

young age. Defense counsel emphasized Mr. Bowie's remorse and candor with police. He indicated that the sentencing guidelines at that time would suggest a sentence between three years and three months and 13 years, depending on aggravating circumstances, and asked that it be served at the Patuxent Institution.

The court sentenced Mr. Bowie to life in prison on the attempted murder count and a concurrent 20-year sentence on the robbery count. In reaching that decision, the judge stated that rehabilitation was either not an issue in this case or, at best, an incidental consideration because Mr. Bowie was "somebody who is capable of this kind of engineering and participating actively in this kind of horror." The court viewed the primary aims of a sentence in Mr. Bowie's case as "segregating people of this sort, who are capable of this kind of behavior … where they can't harm the rest of us[,]" with retribution "[c]lose on [its] heels[.]"

On direct appeal, the Court of Special Appeals affirmed the conviction in an unreported opinion.

Mr. Bowie became eligible for parole after serving 15 years of his sentence (or its equivalent taking into account diminution credits). CS §7-301(d)(1). We understand that he became eligible by at least January 2011, even if he had no diminution credits. We were advised at oral argument that Mr. Bowie had a parole hearing approximately 12 years into his sentence, that the Parole Commission did not make a recommendation at that time, and

that his case was "set off" for future consideration by the Parole Commission.[22]  It is expected that he will have another hearing in the not too distant future.

In March 2016, Mr. Bowie filed a motion under Maryland Rule 4-345 to correct an illegal sentence.  In support of that motion, he attached information that he had obtained from the Parole Commission that, during the previous 20 years, the Parole Commission had recommended parole for 27 inmates serving life sentences, that governors had denied 24 of those recommendations, and that three remained pending.  In his motion, Mr. Bowie argued that those statistics established that the Maryland parole system with respect to juvenile offenders serving life sentences was in fact an executive clemency system that was unconstitutional under *Graham* and *Miller*.  He asserted that the Maryland parole scheme does not afford an offender a meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation and "therefore converts a 'life' sentence into – for constitutional purposes – a 'life without parole' sentence."  The Circuit Court denied the motion without holding a hearing.  In its order, the Circuit Court cited *Kanaras* and stated that "the acts of the Parole Commission and the Commissioner of Correction, which may have the effect of denying certain inmates parole consideration" do not render a sentence illegal.

Mr. Bowie appealed.  In an unreported opinion dated August 11, 2017, the Court of Special Appeals affirmed the Circuit Court for the same reasons that it had dismissed Mr.

---

[22] In the context of the consideration of an inmate for parole, a "set off" essentially refers to a continuance of the matter to a later date.  *See* Project, *Parole Release Decisionmaking and the Sentencing Process*, 84 Yale L.J. 810, 823 (1975).

Carter's appeal[23] – *i.e.,* Mr. Bowie's claims were premature because the Commission had not yet recommended him for parole to the Governor, and there was no indication that the Parole Commission would not apply the factors related to juvenile offenders in its regulations, so his alleged injury was conjectural or hypothetical and he lacked standing to challenge the constitutionality of Maryland's parole system.

Mr. Bowie petitioned this Court for a writ of *certiorari*, which we granted.

3. Matthew McCullough

*Convicted of non-homicide offenses and sentenced to aggregate 100-year sentence*

Matthew McCullough was 17 years old when he committed the offenses for which he is currently imprisoned. In May 2004, a grand jury in the Circuit Court for Baltimore County charged him with various offenses arising from a non-fatal shooting incident at his high school in which several students were injured. The case was tried before a jury in November 2004. The jury found Mr. McCullough guilty of four counts of first-degree assault, although it acquitted him of attempted murder and related counts.

According to the evidence at trial, Mr. McCullough, a transfer student at the school, had had a dispute with another student and was required to stay away from the school for a "cool down" period of several days. However, on the day of the incident, Mr. McCullough returned to the school several times with different friends. On the final occasion, during a charity basketball game at the school, one of the friends brought a gun,

---

[23] As in Mr. Carter's case, the State had moved to dismiss the appeal, but the Court of Special Appeals did not explicitly rule on that motion.

shots were fired (some by Mr. McCullough), and four students were injured. One of the injured students was paralyzed and confined to a wheelchair as a result of the incident. The evidence was not definitive on who fired the shots that resulted in the injuries.

At the sentencing in January 2005, the prosecution argued for a sentence "substantially in excess" of the 50 years incarceration previously imposed on Mr. McCullough's adult co-defendant who had pled guilty under a plea agreement that included a binding term concerning the sentence. The State pointed to Mr. McCullough's role in precipitating the incident, as well as his apparent lack of remorse or willingness to take responsibility for his actions. On Mr. McCullough's behalf, defense counsel asserted that, prior to the death of Mr. McCullough's father in 2003, which resulted in his transfer to the school, Mr. McCullough had been a courteous and respectful member of his community. Witnesses who testified on his behalf at the sentencing said that he was a candidate for rehabilitation.

The Circuit Court acknowledged that the sentencing guidelines suggested a sentence between five and 10 years for each of the four counts, but stated that the guidelines did not capture how "vicious and heinous" the particular crime was and imposed the maximum period of incarceration – 25 years – for each assault count to run consecutively. Thus, Mr. McCullough's aggregate sentence was 100 years incarceration. Mr. McCullough appealed and argued, among other things, that the aggregate sentence violated the constitutional proscription against cruel and unusual punishment. The Court of Special Appeals affirmed the convictions and sentence in an unreported opinion dated November 28, 2005 – a decision that pre-dated the Supreme Court's decisions in *Graham* and *Miller*.

Under current Maryland law, Mr. McCullough will become eligible for parole consideration after serving 50 years of his aggregate sentence – a date decades in the future.

In 2007, Mr. McCullough filed a petition for postconviction review alleging ineffective assistance of counsel, which was denied. The Court of Special Appeals denied his application for leave to appeal that decision. Mr. McCullough raised similar claims in a *habeas corpus* proceeding in the United States District Court for the District of Maryland, which denied that petition.

In March 2016, Mr. McCullough filed a motion under Maryland Rule 4-345 to correct an illegal sentence, citing *Graham* and the other Eighth Amendment decisions concerning the sentencing of juvenile offenders to life without parole. He argued that his 100-year aggregate sentence provided no meaningful opportunity for release, in violation of the constitutional prohibition against cruel and unusual punishment. The Circuit Court denied that motion without a hearing. Mr. McCullough appealed.

In an opinion dated August 30, 2017, the Court of Special Appeals affirmed that decision. 233 Md. App. 702 (2017). The intermediate appellate court held that *Graham* does not apply to an aggregate sentence for multiple crimes committed against multiple victims. 233 Md. App. at 704, 716-44. In the alternative, the court held that, even if *Graham* does apply to those circumstances, Mr. McCullough will be eligible for parole after serving 50 years, a period that the court believed was within his natural life expectancy and therefore shorter than a life sentence. *Id.* at 744-45. In addition, the court held that the factors considered by the Parole Commission comply with *Graham*, and that Mr. McCullough's claim failed under traditional proportionality review. *Id*. at 745-47.

32

Mr. McCullough petitioned for a writ of *certiorari*, which we granted.

## II

## Discussion

The implications of the Supreme Court's recent Eighth Amendment decisions for a case in which a court sentenced a juvenile offender to life without parole are very clear.[24] In such a case, the defendant must be re-sentenced to comply with the holdings of *Graham* and *Miller*. If the defendant was convicted of homicide, the court will need to hold an individualized sentencing hearing to consider whether the defendant is incorrigible.

The three cases before us are more nuanced. None of the three Petitioners was formally sentenced to life without parole. In each case, the Petitioner is pursuing a motion under Maryland Rule 4-345 to correct an illegal sentence, where the motion is based in large part on an argument that the law and practice governing the Maryland parole system has converted the Petitioner's sentence into one that is effectively life without parole. Because there are significant differences in the issues as they relate to an inmate who is serving a formal life sentence – like Mr. Carter and Mr. Bowie – and one who is serving a term of years – like Mr. McCullough – we discuss them separately.

---

[24] The holding of *Roper* concerning the death penalty is of limited significance in Maryland, as the State abolished the death penalty as to all defendants in 2013. Chapter 156, Laws of Maryland 2013. That law provided for commuting existing death sentences to life without parole (which was effected for the four remaining death sentences in early 2015). *See* CS §7-601.

*A.*     *Whether the Sentencing of a Juvenile Offender in Maryland to a Life Term is Cruel and Unusual*

1.     Whether the Motions to Correct an Illegal Sentence can be Decided

The State argues that the appeals of Mr. Carter and Mr. Bowie are premature.  The Court of Special Appeals agreed on the grounds that Mr. Carter and Mr. Bowie lacked standing, that their claims were not ripe, and that the canon of constitutional avoidance counseled against resolving those claims at this time.

*Standing*

With respect to the concept of standing, both Mr. Carter and Mr. Bowie are currently serving life sentences.  There is no question that they have standing to file a motion to correct an illegal sentence under Maryland Rule 4-345.  *Cf. Jones v. Prince George's County,* 378 Md. 98, 118 (2003) (common law standing depends on whether one is aggrieved in that the party is "personally and specifically affected in a way different from … the public generally") (citations omitted).  Whether that motion has merit or raises issues ripe for litigation is, of course, another matter.[25]  *See Sugarloaf Citizens' Ass'n v.*

---

[25] Like the intermediate appellate court, the State cites *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992), for the proposition that, to have standing, a party must have suffered an injury in fact, either actual or imminent, rather than one that is conjectural or hypothetical.  *Lujan* was a civil action brought in federal court by environmental groups against the Secretary of the Interior.  Plaintiffs attempted to establish standing by alleging an interest in seeing or studying endangered species that might become extinct due to government agencies funding development projects abroad.  Both Mr. Bowie and Mr. Carter are imprisoned under the sentences they are challenging.  In no sense are their interests in the legality of their sentences conjectural or hypothetical.

*Department of the Environment*, 344 Md. 271, 295 (1996) ("standing to challenge governmental action, and the merits of the challenge, are separate and distinct issues").

*Ripeness*

With respect to the issue of ripeness, the essence of the claims by these two Petitioners is that the design of the parole system in Maryland does not comply with the Eighth Amendment standards announced in the Supreme Court's recent trilogy. Under those cases, a life sentence imposed on a juvenile offender must provide "a meaningful opportunity for release" in the future based on the offender's rehabilitation – unless the offender was convicted of homicide and determined to be incorrigible in an individualized sentencing proceeding. If the laws and regulations governing the Maryland parole system with respect to a juvenile offender serving a life sentence do not provide that opportunity, a sentence of life imprisonment fails under the Eighth Amendment prohibition against cruel and unusual punishments.

The answer to the question as to whether the Maryland parole system provides a meaningful opportunity for release does not turn on the outcome of a particular parole hearing. The parole system may be fully compliant with the Eighth Amendment and deny release to an inmate like Mr. Carter or Mr. Bowie. As the Supreme Court stated in *Graham*, the Eighth Amendment does not require a "guarantee [of] eventual freedom." 560 U.S. at 75. On the other hand, a parole system that fails to comply with Eighth Amendment standards and that is an executive clemency system in disguise may nevertheless result in the release of a juvenile offender serving a life sentence. Such a result may render a claim under *Graham* or *Miller* moot, but it would not determine the merits of the claim.

Thus, the outcome of a parole hearing does not necessarily indicate whether the parole system complies with the Eighth Amendment. To the extent that the claims of Mr. Carter and Mr. Bowie are based on the structure of the parole system in Maryland (as opposed to its operation in practice), adjudication of their claims that their sentences are illegal need not await the outcome of their parole hearings.

*Canon of Constitutional Avoidance*

With respect to the canon of constitutional avoidance, it is true that "[t]his Court has emphasized, time after time, that the Court's strong and established policy is to decide constitutional issues only when necessary." *VNA Hospice of Md. v. Dep't of Health and Mental Hygiene*, 406 Md. 584, 604 (2008) (internal citations and quotation marks omitted). However, that canon relates to *how* a court decides a case, not *whether* it decides the case. We will not decide constitutional questions in these cases if we can resolve these appeals without doing so. But we cannot resort to that rationale to avoid deciding these cases at all.

2.      What Claims are Cognizable on a Motion to Correct an Illegal Sentence

There remains the question whether the contentions of Mr. Carter and Mr. Bowie are cognizable in a proceeding on a motion to correct an illegal sentence under Maryland Rule 4-345. "A motion to correct an illegal sentence ordinarily can be granted only where there is some illegality in the sentence itself or where no sentence should have been imposed." *Evans v. State*, 382 Md. 248, 278-79 (2004). There is a distinction "between errors that inhere in the sentence itself, and other errors that may affect a sentence but do not fall under the purview of Rule 4-345(a)." *Barnes v. State*, 423 Md. 75, 85 (2011).

In *Kanaras,* the Court distinguished between sentences that are "inherently" illegal and those that are carried out in some illegal fashion.  How the Parole Commission and the Governor are supposed to discharge their duties under Maryland law is inherent in the sentence, but what they do in practice is not.  As the Court stated in *Kanaras*, other causes of action are more appropriate to litigate claims that the Parole Commission and others involved in the parole system are not carrying out their responsibilities.[26]  *Kanaras*, 357 Md. at 185.  To the extent that Mr. Carter and Mr. Bowie are challenging the actual practice of the Parole Commission and the Governor in making parole decisions,[27] their claims are outside the scope of a motion to correct an illegal sentence.

We thus agree with the Court of Special Appeals that whether the Parole Commission and others involved in the parole system are carrying out their duties in practice is not at issue in this appeal.  However, Mr. Carter's and Mr. Bowie's motions do not depend solely on how parole decisions have been made, or might be made in the future.  In the context of a motion to correct an illegal sentence, their challenge must rest on the laws that govern parole decisionmaking.

This Court addressed an analogous issue in *Gluckstern v. Sutton*, 319 Md. 634, 667-72, *cert. denied*, 498 U.S. 950 (1990).  In that case, the defendant was convicted of two

_____

[26] For example, several of the theories raised by Petitioners are currently being litigated in federal court in a lawsuit brought under 42 U.S.C. §1983. *Maryland Restorative Justice Initiative et al. v. Hogan et al*, 2017 WL 467731 (February 3, 2017) at \*19 - \*26 (affirming in part and denying in part a motion to dismiss by the State).

[27] Petitioners and supporting amici have proffered statistics that indicate that parole of inmates serving life sentences in Maryland is a rare event.

counts of first-degree murder, but his two life sentences were suspended while he served an indefinite term of detention in the Patuxent Institution as a "defective delinquent." 319 Md. at 638-39. At the time, the Patuxent Institution had independent authority to parole inmates at that institution without the Governor's approval, even if the inmate was serving a life sentence. *Id.* at 640-42. Several years later, the Legislature changed the law to require gubernatorial approval to parole Patuxent inmates. *Id.* at 644. After the Governor twice refused to approve Patuxent's favorable parole recommendation, the inmate filed a petition for *habeas corpus*, alleging a violation of the *ex post facto* clause of the Constitution and demanding release from custody. *Id.* at 644-45.

This Court ruled that gubernatorial approval was not required for the inmate's release. The core of that decision was that "parole eligibility is part of the law annexed to the crime at the time of a person's offense." *Gluckstern*, 319 Md. at 667 (internal citations and quotation marks omitted). The Court noted that the "requirement of gubernatorial approval for obtaining a parole [has] the force of law, and is not a discretionary internal policy[.]" *Id.* at 672. Thus, in *Gluckstern*, the absence of gubernatorial discretion in the parole decision at the time the sentence was imposed was inherent in the sentence and gubernatorial approval could not be required retroactively, regardless of what decision the Governor might make.

Similarly, the distinction between the *existence* of discretion and how that discretion is exercised was the distinction recognized in *Kanaras* between what is cognizable on a motion to correct an illegal sentence and what must be pursued in other causes of action. Accordingly, we hold that the Governor's role in the parole process inheres in a sentence

38

of life with possibility of parole, and is cognizable on a motion to correct an illegal sentence.

3. Whether the Sentences of Mr. Carter and Mr. Bowie are Illegal

*Contentions*

The argument that Mr. Carter's and Mr. Bowie's sentences are illegal is rooted in the fact that CS §7-301(d) does not require the Governor to consider any particular criteria in deciding whether to approve parole for an inmate serving a life sentence. As the Court said in *Lomax*, "the Governor is free to employ whatever guidelines he desires" because "the General Assembly has not set forth any factors to guide the Governor's exercise of discretion in approving or disapproving parole recommendations." 356 Md. at 578-79 n.2, 581.

The State observes that the discretion that the Legislature has granted the Governor has been upheld against constitutional challenges by this Court and the Fourth Circuit. *Lomax*, 356 Md. at 578-80 & n.2 (1999); *Griggs v. Maryland*, 263 F.3d 355 (4th Cir. 2001). This is certainly true as to adult offenders. In general, "[t]here is no constitutional or inherent right of a convicted person to be conditionally released before the expiration of a valid sentence." *Greenholtz v. Inmates of Nebraska Penal and Correctional Complex*, 442 U.S. 1, 7 (1979). Parole in some states has been described as "a matter of grace" that "may be denied for any reason (except, of course, an unlawful one such as race), or for no reason." *Garner v. Jones*, 529 U.S. 244, 258-59 (2000) (Scalia, J., concurring); *see also Swarthout v. Cooke,* 562 U.S. 216, 220 (2011) ("the States are under no duty to offer parole to their prisoners.").

However, a "meaningful opportunity to obtain release based on demonstrated maturity or rehabilitation" – by parole or otherwise – is not simply a "matter of grace" for juveniles serving life sentences. It is required by the Eighth Amendment. The question is whether the Maryland system complies with *Miller* and *Graham* – *i.e.*, whether the peculiar features of Maryland's system for releasing inmates serving life sentences provides that meaningful opportunity for release for a juvenile offender serving a life sentence.

The absence of criteria in the statute for the Governor's decision whether to approve or disapprove a parole recommendation, Mr. Carter and Mr. Bowie argue, reduces the Maryland parole system for an inmate serving a life sentence to an executive clemency system that is not equivalent to parole. And, under *Graham* and *Solem*, an executive clemency system cannot rescue a sentence that is otherwise excessive for purposes of the Eighth Amendment.[28]

---

[28] Some state supreme courts have ordered the re-sentencing of juvenile offenders serving life sentences in response to similar arguments. *State v. Young*, 794 S.E.2d 274, 279 (N.C. 2016) (periodic judicial review and recommendation to Governor concerning parole after inmate served 25 years did not comply with *Miller* when the Governor's parole decision was left to "unguided discretion"); *Parker v. State*, 119 So.3d 987, 997 (Miss. 2013) (availability of "conditional release" once inmate reached age 65 and had served at least 15 years was "akin to clemency" and insufficient to comply with *Miller*).

Several courts have held that a parole system in which parole for an inmate serving a life sentence depends on a prior discretionary commutation by a governor of that sentence to a term of years does not satisfy *Graham* or *Miller*. *State v. Castaneda*, 842 N.W.2d 740, 757 (Neb. 2014), *cert. denied*, 138 S.Ct. 83 (2017) ("mere existence of a remote possibility of parole" as a result of a commutation did not comply with *Miller*); *Bonilla v. State*, 791 N.W.2d 697, 701-3 (Iowa 2010) (vacating "without parole" portion of sentence to comply with *Graham*); *State v. Dyer*, 77 So.3d 928, 930 (La. 2011) ("the Eighth Amendment precludes the state from interposing the Governor's ad hoc exercise of executive clemency as a gateway to accessing procedures the state has established for ameliorating long terms

We would certainly reach that conclusion if the Glendening policy remained in effect. At the time Governor Glendening announced his policy, it was consistent with the contemporary understanding of the Constitution and of the Governor's statutory powers, as this Court held in *Lomax* and *Kanaras*. If a Governor were to adopt that same policy today, it would be in defiance of the Constitution, at least as applied to juvenile offenders. Such a policy, lawful as it may have been (and may still be) as to adult offenders, is now clearly unconstitutional as to a juvenile non-homicide offender (and most juvenile homicide offenders), as it offers no meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation, but only on the basis of age and terminal illness. Subsequent to *Graham* and *Miller*, we could not ignore similar statements of a Maryland chief executive, who takes an oath under the Maryland Constitution to "support the Constitution" of the United States, as well as the "Constitution and Laws" of Maryland. Maryland Constitution, Article I, §9; Maryland Code, General Provisions Article, §2-202.

Even in the absence of a policy that was unconstitutional on its face with respect to juvenile offenders, the unfettered discretion of the Governor under CS §7-301(d) to decide whether or not to grant parole for juvenile offenders serving life sentences would be problematic by itself, as the Governor potentially could disapprove a parole recommendation without reference to any criteria related to the demonstrated maturity or rehabilitation of the inmate.

---

of imprisonment" for juvenile offenders); *Bear Cloud v. State*, 294 P.3d 36, 45 (Wyo. 2013).

41

*Remedies*

If the structure of the Maryland parole system does render the sentences of Mr. Carter and Mr. Bowie effectively life without parole, then those sentences violate the Eighth Amendment and would therefore be illegal. Mr. Bowie would be entitled to a new sentence compliant with *Graham*. Mr. Carter would be entitled to a new sentencing proceeding at which the court would consider whether he was one of the few juvenile homicide offenders who is incorrigible and may therefore be sentenced constitutionally to life without parole. Otherwise, he would be entitled to be re-sentenced like Mr. Bowie.

Courts in other states have had to grapple with how to ensure the legality of existing and future sentences of juvenile offenders under the laws of their respective states in the wake of *Graham* and *Miller* while not intruding on the legislature's role in defining offenses and punishments.[29] Some courts, expressing discomfort, have assumed the role of temporary legislator in directing trial courts how to comply with the Eighth Amendment with respect to post conviction reviews and future sentencing. *See, e.g., Stevens v. State*, 422 P.3d 741, 749 (Okla. Crim. App. 2018) (in the course of granting relief to a juvenile offender serving life without parole sentence, court outlined "interim rules of procedure" for trial courts to comply with *Miller* "[u]ntil such time as the Legislature addresses this matter"); *Commonwealth v. Batts*, 163 A.3d 410, 450-51 (Pa. 2017) ("The General

---

[29] In some states in which the legislature has already amended the statutes governing the parole system in light of the Supreme Court trilogy, the courts have refrained from addressing the adequacy of those measures until they were implemented. *People v. Franklin*, 370 P.3d 1053, 1065-67 (Cal.), *cert. denied*, 137 S.Ct. 573 (2016); *see also State v. Zarate*, 908 N.W.2d 831, 847-48 (Iowa 2018).

Assembly has not taken any appreciable steps to create a separate sentencing statute or to revise the existing law so that it applies to juveniles … Therefore … we will exercise our constitutional power of judicial administration to devise a procedure for the implementation of the *Miller* and *Montgomery* decisions…") (internal quotations and citations omitted); *Dyer*, 77 So.3d at 931 n.6 ("Thus, our decision in relators' cases is an interim measure (based on the legislature's own criteria) pending the legislature's response to *Graham*"); *Bear Cloud*, 294 P.3d at 45 (acknowledging that it is legislature's role to determine penalties for offenses, but outlining procedures for trial courts to follow and criteria to be considered in sentencing juvenile offenders to comply with *Graham* and *Miller* "at least until the Legislature amends the sentencing scheme for juveniles"); *Parker*, 119 So.3d at 998 (vacating sentence of juvenile offender for non-compliance with *Miller* and outlining sentencing options for trial courts as "stopgap measure" pending action by state legislature).

We need not follow that path.

*Effect of the Parole Commission Regulations and the 2018 Executive Order*

The statute is not all we have here. There are regulations and an executive order that govern parole decisions relating to juvenile offenders.

As noted above,[30] the Parole Commission has adopted regulations that, in the case of a juvenile offender, explicitly require consideration of the offender's age at the time of the offense, other factors that distinguish juveniles from adults, and developments that

---

[30] See Part I.B. of this opinion.

43

indicate that the offender has demonstrated maturity and rehabilitation. COMAR 12.08.01.18A(3). In other words, the Parole Commission, in assessing whether to parole a juvenile offender – or make an affirmative recommendation to the Governor in the case of an inmate serving a life sentence – is to apply the factors identified by the Supreme Court in *Graham* and *Miller* necessary to comply with the Eighth Amendment. Arguably, CS §7-305 already required the Parole Commission – although not the Governor – to take into account an inmate's youth and demonstrated rehabilitation in making parole decisions. The regulations leave no doubt. Those regulations were adopted pursuant to legislative direction in CS §7-207 and have the force of law. *In re J.C.N.*, ___ Md. ___, 2018 WL 3640988 (July 31, 2018) at *7.

Of particular significance is the 2018 Executive Order. That executive order attempts to bridge the gap between the unfettered discretion that the Legislature has given to the Governor with respect to parole of inmates serving life sentences and the requirements of the Eighth Amendment as to juvenile offenders. Is the 2018 Executive Order effective and appropriate to bring the sentences of Mr. Carter and Mr. Bowie – and those of other juvenile offenders like them – into compliance with the Constitution and once again legal for purposes of a motion under Maryland Rule 4-345?[31] In our view, it is.

---

[31] Assessment of the legality of a sentence, often an exercise done with reference to the law at the time of sentencing, has a certain "back to the future" quality in these cases. These sentences were legal at the time they were imposed, under the contemporary understanding of the relevant statutes and constitutional provisions, and remained so for more than a decade. They may have become illegal recently by virtue of the retroactive application of *Graham* and *Miller*. If necessary, they could be restored retroactively to legality through corrective legislation. *See, e.g., State v. Castaneda*, 842 N.W.2d 740, 760-62 (Neb. 2014) (re-sentencing under newly enacted legislation compliant with *Miller*

The Governor has the obligation under the Maryland Constitution to "take care that the Laws are faithfully executed." Maryland Constitution, Article II, §9. In carrying out that responsibility, the Governor has broad authority to issue executive orders that regulate conduct and procedures within the executive branch of State government. Maryland Constitution, Article II, §24; Maryland Code, State Government Article, §3-401 *et seq*. An executive order issued under either grant of authority has the force of law, so long as it is not inconsistent with existing statutes.[32] *MCEA v. Schaefer*, 325 Md. 19, 27 & n.3 (1991). For example, the Governor's authority to issue executive orders concerning employment rights, obligations, and working conditions of executive branch employees is well established. *MCEA, supra; McCulloch v. Glendening*, 347 Md. 272 (1997). Like the authority to make rules governing the State personnel system at issue in *MCEA*, the Governor's discretion regarding parole is "extremely broad." 325 Md. at 28. Although the 2018 Executive Order was not issued pursuant to an explicit grant of rulemaking authority under the parole statute, it sets forth rules of conduct and procedure for the exercise of the Governor's discretion under the parole statute.

---

would not violate *ex post facto* clause). Or, as we indicate in the text, their legality can be restored by the recent executive order. There appears to be a sort of time travel here that boggles the judicial mind – or at least one without an advanced physics degree.

[32] An executive order that makes changes in the Executive Branch or government programs, inconsistent with existing law, must be submitted in statutory form to the General Assembly where it is subject to disapproval by the Legislature. Maryland Constitution, Article II, §20.

The 2018 Executive Order is certainly consistent with existing law. The State Constitution authorizes the General Assembly to create a parole system; the General Assembly has done so and conferred discretion on the Governor concerning parole of inmates serving life sentences; the federal and State constitutions mandate certain considerations relating to the parole of juvenile offenders serving life sentences. The 2018 Executive Order is consistent with all of those laws.

Executive orders have sometimes been challenged as usurping legislative authority, in violation of the separation of powers contemplated in Article 8 of the Maryland Declaration of Rights. *See MCEA*, 325 Md. at 28-34; *McCulloch*, 347 Md. at 282-87. That argument would have no merit in relation to the 2018 Executive Order. In CS §7-301(d), the General Assembly has clearly delegated discretion to the Governor with regard to the parole of inmates serving life sentences. The 2018 Executive Order does not attempt to broaden that discretion, but rather to cabin it consistent with constitutional requirements recognized after the passage of that statute. That does not "abdicate or bargain away" the discretion granted by statute. *McCulloch*, 347 Md. at 276. What the Governor "surrendered" in the 2018 Executive Order was the very defect that put into question the constitutionality of the parole system, including the discretion conferred on him by statute. Nor can it be said that the Governor has usurped legislative authority by specifying that the discretion conferred by the Legislature is to be exercised constitutionally.

*Summary*

Thus, in assessing compliance with the Eighth Amendment standards, we have more than the bare statute on parole. While the general statutory standards that govern the Parole

46

Commission's decisions already arguably take into account demonstrated maturity and rehabilitation, the Parole Commission has exercised the authority delegated by the General Assembly and has adopted regulations that incorporate factors specific to juvenile offenders. Those regulations have the force of law. Moreover, the Governor has adopted an executive order concerning parole recommendations related to juvenile offenders that is clearly designed to comply with *Graham* and *Miller* and to make transparent the Governor's consideration of those factors. That also has the force of law.

It might be argued that an executive order is subject to amendment or rescission with minimal process and therefore should not be given the same weight that might be accorded an amendment of the parole statute by the General Assembly.[33] That may be true, but, nonetheless, the 2018 Executive Order does have the force of law. We cannot pretend that it does not exist. As long as it does exist, we cannot say that the sentences of Mr. Carter or Mr. Bowie are illegal.[34]

---

[33] After this Court upheld the executive order in *McCulloch*, the General Assembly enacted legislation modeled on that order "to provide a more solid base for a collective bargaining regime and not have it rest solely on an Executive Order that could be modified or revoked by subsequent Governors[.]" *Ehrlich v. Maryland State Employees Union*, 382 Md. 597, 601 (2004).

[34] The concerns expressed in Chief Judge Barbera's concurring and dissenting opinion that the Parole Commission and the Governor may in practice simply pay lip service to the criteria set forth in the regulations and 2018 Executive Order and accord them no actual weight in parole recommendations and decisions are premature. For the reasons set forth in Part II.A.2 of this opinion, any contentions along those lines are not cognizable in a motion to correct an illegal sentence. As indicated in *Kanaras*, such concerns can be addressed in an appropriate action that allows for a record to be made as to how these laws are executed in practice.

***B.***     ***Whether the Sentencing of Juvenile Offender to a Lengthy Term of Years May Be Cruel and Unusual***

Mr. McCullough's circumstances require a different analysis. He was sentenced to an aggregate term of 100 years in prison rather than a formal life sentence. That sentence is the result of the trial court's decision to impose, and to run consecutively, the maximum sentence with respect to four assault convictions relating to four different victims of the same shooting incident. As indicated earlier, Mr. McCullough will be eligible for parole after serving 50 years of that aggregate sentence. Unlike the situation with Mr. Carter and Mr. Bowie, the Governor does not have a role under the parole statute in determining whether he is released on parole.

Courts have generally distinguished sentences cast in terms of years from sentences that are explicitly for "life," at least with respect to adult offenders. *See, e.g.*, *Lockyer v. Andrade*, 538 U.S. 63, 74 n.1 (2003) (sentence of 50 years to life under recidivist statute for adult defendant distinguished from life sentence under recidivist statute held to violate Eighth Amendment in *Solem*). However, if one thing is clear in *Graham*, it is that the rules that apply to adult offenders are not necessarily the same for juvenile offenders.

We consider first *whether* a sentence expressed as a term of years can be equivalent to a sentence of life without parole for purposes of applying *Graham* and *Miller*. If so, the question then is *when* a sentence expressed as a term of years is equivalent to life without parole. A related question relevant to Mr. McCullough's situation is *how* an aggregate sentence comprised of separate consecutive sentences – what we shall refer to as a "stacked sentence" – should be considered in this analysis, as compared to a lengthy sentence for a

48

single offense.  Finally, we must apply the analysis to Mr. McCullough's particular circumstances.

1.      *Whether* a Term of Years Can Be a Life without Parole Sentence

The initial question is whether a sentence stated as a term of years for a juvenile offender can ever be regarded as a sentence of life without parole for purposes of the Eighth Amendment.  It seems a matter of common sense that the answer must be "yes." Otherwise, the Eighth Amendment proscription against cruel and unusual punishment in the context of a juvenile offender could be circumvented simply by stating the sentence in numerical terms that exceed any reasonable life expectancy rather than labeling it a "life" sentence.  The vast majority of state supreme courts to consider this question agree that a sentence stated as a term of years, or as a life sentence with parole after a specified number of years, can fall within the scope of *Graham* or *Miller* as a *de facto* sentence of life without parole.[35]

---

[35] *See People v. Caballero*, 282 P.3d 291 (Cal. 2012), *cert. denied*, 135 S.Ct. 1564 (2015); *Casiano v. Comm'r of Correction*, 115 A.3d 1031 (Conn. 2015), *cert. denied*, 136 S.Ct. 1364 (2016); *People v. Reyes*, 63 N.E.3d 884 (Ill. 2016); *Johnson v. State*, 215 So.3d 1237 (Fla. 2017); *State v. Null*, 836 N.W.2d 41 (Iowa 2013) (applying state constitution); *Morgan v. State*, 217 So.3d 266 (La. 2016); *State ex. rel Carr v. Wallace*, 527 S.W.3d 55 (Mo. 2017); *Steilman v. Michael*, 407 P.3d 313, 319 (Mont. 2017), *cert. denied*, 138 S.Ct. 1999 (2018); *State v. Boston*, 363 P.3d 453, 457 (Nev. 2015); *State v. Zuber*, 152 A.3d 197, 211 (N.J.), *cert. denied*, 138 S.Ct. 152 (2017); *Ira v. Janecka*, 419 P.3d 161 (N.M. 2018); *State v. Moore*, 76 N.E.3d 1127 (Ohio 2016), *cert. denied*, 138 S.Ct. 62 (2017); *Kinkel v. Persson*, 417 P.3d 401 (Or. 2018), *petition for cert. filed*, No. 18-5634 (Aug. 8, 2018); *State v. Ramos*, 387 P.3d 650 (Wash. 2017); *Bear Cloud v. State*, 294 P.3d 36, 45 (Wyo. 2013).

A few state supreme courts have held to the contrary.  *See Veal v. State*, 810 S.E.2d 127 (Ga. 2018), *petition for cert. filed*, No. 17-1510 (May 7, 2018); *State v. Ali*, 895 N.W.2d 237, 253 (Minn.), *cert. denied*, 138 S.Ct. 640 (2017); *Lucero v. People*, 394 P.3d 1128 (Colo.), *cert. denied*, 138 S.Ct. 641 (2017); *Vasquez v. Commonwealth*, 781 S.E.2d 920

This conclusion is supported not simply by common sense or by a straw poll of other courts. It is also consistent with the reasoning of *Graham* and *Miller*. That reasoning is equally applicable to a sentence that is labeled as "life without parole" as to a sentence expressed as a number of years without parole when the number is high enough.[36] The fundamental premise underlying the Court's decision in *Graham* is that "[a] sentence lacking any legitimate penological justification is by its nature disproportionate to the

(Va. 2016), *cert. denied*, 137 S.Ct. 568 (2017). To a certain extent these decisions appear to be based more on caution than conviction. *See, e.g., Ali*, 895 N.W.2d at 246 ("Admittedly, we have elected to follow well-reasoned Supreme Court dictum in the past. But here, we simply hold that absent further guidance from the Court, we will not extend the *Miller/Montgomery* rule to include … [a *de facto* life sentence.]") (internal citations omitted); *Vasquez,* 781 S.E.2d at 928 ("attempting to answer these questions … with the level of specificity necessary for a principled application of Eighth Amendment law[] would require a proactive exercise inconsistent with our commitment to traditional principles of judicial restraint.").

Although the majority of state intermediate appellate courts have come to the same conclusion as the state supreme courts listed above, we are aware of at least one decision to the contrary. *State v. Kasic*, 265 P.3d 410 (Ariz.Ct.App. 2011).

At least four federal courts of appeal have recognized that a sentence expressed as a term of years was a *de facto* sentence of life without parole. *Kelly v. Brown*, 851 F.3d 686 (7th Cir. 2017); *United States v. Grant*, 887 F.3d. 131 (3d Cir. 2018); *Moore v. Biter*, 725 F.3d 1184, 1190 (9th Cir. 2013); *Budder v. Addison*, 851 F.3d 1047 (10th Cir.), *cert. denied*, 138 S.Ct. 475 (2017). One circuit assumed so without deciding. *United States v. Mathurin*, 868 F.3d 921 (11th Cir. 2017), *petition for cert. filed*, No. 17-7988 (Mar. 6, 2018). Only one federal court of appeals has held to the contrary, and it was applying a deferential review standard under the federal Anti-Terrorism and Effective Death Penalty Act to a state court sentence and held only that the issue whether *Graham* applied to a *de facto* life sentence stated as a term of years was "not clearly established." *Bunch v. Smith*, 685 F.3d 546, 548-52 (6th Cir. 2012), *cert. denied*, 569 U.S. 947 (2013).

[36] The Supreme Court did not appear to be making a distinction between the two types of sentences. In *Graham*, the Court referred to the sentence in that case at least twice as a "term of years" sentence. 560 U.S. at 61, 70.

offense." *Graham*, 560 U.S. at 71. The Court considered whether any theory of penal sanction could provide an adequate justification for sentencing a juvenile non-homicide offender to life without parole, and found none. *Id.* at 71. The same test applied to a sentence of a lengthy term of years without eligibility for parole yields the same conclusion.

The *Graham* Court's reasoning regarding retribution is equally applicable to a lengthy term-of-years sentence as it is to one labeled as "life." Sentences must directly relate to the personal culpability of the offender, which is diminished in the case of a juvenile offender who has not committed homicide. 560 U.S. at 71-72. In terms of deterrence, "the same characteristics that render juveniles less culpable than adults suggest … that juveniles will be less susceptible to deterrence." *Id*. at 72 (citation and quotation marks omitted). Regardless of what the punishment is, children are "less likely to take a possible punishment into consideration when making decisions[,]" especially "when that punishment is rarely imposed." *Id.* at 72. There is no reason to believe that a juvenile would be deterred from crime depending on whether the sentence was "life" or a number of years that is clearly longer than his or her own life. Finally, there is no difference in terms of rehabilitation or incapacitation between two sentences that would both incarcerate the defendant for the duration of the defendant's life. Neither type of sentence contemplates the defendant returning to society, either as a reformed citizen or as a potential threat. Because no penological theory justifies treating a *de facto* life without parole sentence differently than an actual life without parole sentence for a juvenile offender, we hold that a lengthy term-of-years sentence can be a life sentence for purposes of the Eighth Amendment. A distinction between the two makes no difference in terms of

"reconciliation with society," "denial of hope," the "incentive to become a responsible individual," a "chance of fulfillment outside of prison walls" or whether a prisoner "will die in prison[.]" *Id*. at 79.

2.      *When* a Term of Years Can Be a Life without Parole Sentence

A more difficult question is where to draw the line between sentences expressed as a term of years that are equivalent to life without parole and those that are not. Under the analysis in *Graham*, the Eighth Amendment requires that there be a "meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation" available to a juvenile non-homicide offender. However, the Supreme Court did not say when that opportunity must be available. Some lines must be drawn. *Cf. Solem,* 463 U.S at 294 (stating, in another Eighth Amendment context, that "[t]he courts are constantly called upon to draw similar lines in a variety of contexts").

Courts have applied several benchmarks to determine when a sentence of lengthy term of years is equivalent to a life sentence without parole for a juvenile offender:

- *Comparison to natural life expectancy*. A sentence under which the defendant will not be eligible for parole until a date that exceeds the offender's natural life expectancy would appear to be synonymous with life without parole. A number of courts have held that a sentence under which the offender would not be eligible for parole until a date well beyond the offender's life expectancy is equivalent to life without parole.[37] Some courts have pointed out that this can

_____

[37] *See, e.g., State ex rel. Morgan v. State*, 217 So.3d at 272 (99 years without opportunity for parole); *People v. Caballero*, 282 P.3d at 296 (112 years without opportunity for parole); *see also Johnson v. State*, 215 So.3d 1237, 1243 (Fla. 2017) (sentence must provide for early release at a time that is not beyond the juvenile offender's natural life); *State v. Moore*, 76 N.E.3d at 1140 (77-year prison term is *de facto* life sentence because at time of sentencing it exceeded additional life expectancy for average juvenile male and average juvenile black male); *United States v. Mathurin*, 868 F.3d at 932-36 (referring to similar benchmark as *Moore*).

be a difficult benchmark to apply fairly, given demographic differences in individual life expectancy.[38]

- *Comparison to parole date for life sentence*.  Some courts have compared the eligibility date for parole under a lengthy term-of-years sentence to the parole eligibility date for an offender sentenced to life in prison or for a murder conviction in the particular jurisdiction; if the parole eligibility date for the term of years is later, then it is treated as a life without parole sentence.[39]

- *50-year threshold*.  Many courts have concluded that a sentence of a term of years that precludes parole consideration for a half century or more is equivalent to a sentence of life without parole.[40]  This seems consistent with the observation

---

[38] *E.g.*, *People v. Contreras*, 411 P.3d 445, 448-51 (Cal. 2018); *State v. Zuber*, 152 A.3d at 214 (N.J.) ("Judges … should not resort to general life expectancy tables when they determine the overall length of a sentence.  Those tables rest upon informed estimates, not firm dates, and the use of factors like race, gender, and income could raise constitutional issues."); *see also* Adele Cummings & Stacie Nelson Colling, *There is No Meaningful Opportunity in Meaningless Data:  Why it is Unconstitutional to Use Life Expectancy Tables in Post-Graham Sentences*, 18 U.C.Davis J.Juv.L. & Pol'y 267 (2014) (criticizing reliance on life expectancy tables by Colorado courts in sentencing juveniles).

[39] *See, e.g., State v. Moore*, 76 N.E.3d at 1140 ("*Graham* cannot stand for the proposition that juveniles who do not commit homicide must serve longer terms in prison than the vast majority of juveniles who commit murder, who, because of *Miller*, are all but assured the opportunity to demonstrate maturity and rehabilitation at a meaningful point in their sentences."); *see also Commonwealth v. Perez*, 80 N.E.3d 967 (Mass. 2017) (holding, under cognate state constitutional provision, that sentencing court must hold hearing on incorrigibility before sentencing juvenile offender to sentence where eligibility for parole would be later than eligibility as a result of murder conviction).

[40] *See State v. Zuber*, 152 A.3d at 211-12 (55 years before parole eligibility constitutes a life without parole sentence); *State v. Null*, 836 N.W.2d at 71-73 (52.5 years) (applying Iowa state constitution); *Casiano v. Comm'r of Correction*, 115 A.3d at 1044-45 (50 years); *State ex. rel Carr v. Wallace*, 527 S.W.3d at 63 (50 years); *People v. Contreras*, 411 P.3d at 454 (50 years); *Davis v. State*, 415 P.3d 666, 676 (Wyo. 2018) (almost 45 years); *cf. Bear Cloud v. State*, 334 P.3d 132, 142 (2014) (noting that United States Sentencing Commission equates a sentence greater than 470 months – just over 39 years – to a life sentence).

The Supreme Court of Missouri declined to "arbitrarily pick the point" at which a sentence becomes *de facto* life without parole in *Willbanks v. Dep't of Corr.*, 522 S.W.3d

of the *Graham* Court that the defendant in that case would not be released "even if he spends the next half century attempting to atone for his crimes and learn from his mistakes." 560 U.S. at 79. Many decisions that attempt to identify when a specific term of years without eligibility for parole crosses the line into a life sentence for purposes of the Eighth Amendment appear to cluster under the 50-year mark.

- *Comparison to legislative reforms*. In *Graham*, the Supreme Court began its analysis with a search for "objective indicia of a national consensus" and

---

238, 245-46 (Mo.), *cert. denied*, 138 S.Ct. 304 (2017). The same year, that court applied *Miller* in a case involving three concurrent sentences of life with possibility of parole at 50 years "because [petitioner] was sentenced to the harshest penalty other than death" authorized by statute. *State ex. rel Carr*, 527 S.W. 3d at 60. Although the court did not characterize that sentence as a *de facto* sentence of life without parole, it treated a sentence that delayed parole eligibility for 50 years as within the scope of *Miller*.

Occasionally courts recognize in principle that there can be *de facto* life sentences, but hold that the length of the sentence in the particular case is too short to qualify. *State v. Diaz*, 887 N.W.2d 751, 768 (S.D. 2016) (observing that no case has held that sentence of incarceration without eligibility for parole for 40 years lacks a "meaningful opportunity to obtain release."); *State v. Charles*, 892 N.W. 2d 915, 921 (S.D.), *cert. denied*, 138 S.Ct. 407 (2017) (availability of parole after 45 years in custody provides meaningful opportunity for release); *State v. Smith*, 892 N.W.2d 52, 66 (Neb.), *cert. denied*, 138 S.Ct. 315 (2017) (46 years without eligibility for parole not long enough to qualify as life without parole); *Ira v. Janecka*, 419 P.3d 161, 170 (N.M. 2018) (46 years before inmate would have an opportunity to obtain release is "the outer limit of what is constitutionally acceptable").

We found no significant authority holding that a sentence that precludes release for more than 50 years is *not* equivalent to life without parole for a juvenile offender. In *State v. Russell*, 908 N.W.2d 669 (Neb. 2018), *petition for cert. filed*, No. 17-9579 (June 22, 2018), the court upheld a sentence under which the defendant would not be eligible for parole for 55 years. It is unclear if that court upheld the sentence because it is constitutional to sentence some juvenile murderers to life without parole under *Miller* or because the court believed that parole eligibility after 55 years allowed a meaningful opportunity for release.

The State has identified several decisions of intermediate appellate courts in Florida to the contrary; however, these were part of a split in authority in that state. The Florida Supreme Court has acknowledged that a 45 year sentence that must be served in full violates the holding in *Graham*, and that a longer sentence offering parole still "must ensure that a juvenile nonhomicide offender … does not receive a sentence that provides for early release at a time beyond his or her natural life." *Johnson v. State*, 215 So.3d at 1243.

indicated that the "the clearest and most reliable objective evidence of contemporary values is the legislation enacted by the country's legislatures."[41] Similarly, some courts have looked to how various state legislatures have amended laws governing sentencing and parole to comply with the Supreme Court's recent decisions concerning the Eighth Amendment and sentencing of juvenile offenders.[42]  Of course, how each state has amended its law depends on the vagaries of its sentencing system (*e.g.*, determinate vs. indeterminate), the possible sentences for certain crimes, and other policy considerations.[43]  There

[41] *Graham*, 560 U.S. at 62 (internal quotation marks and citations omitted); *cf. Solem*, *supra*, 463 U.S. at 292 ("proportionality analysis under the Eighth Amendment should be guided by objective criteria, including … the sentences imposed for commission of the same crime in other jurisdictions").

[42] *State v. Zarate*, 908 N.W.2d 831, 844-45 (Iowa 2018); *People v. Contreras*, *supra*, 411 P.3d at 455-56 ("In enacting these sentencing reforms, these state legislatures observed that sentencing juvenile nonhomicide offenders to 50 or more years of incarceration without parole eligibility is not consistent with *Graham*.").

[43] For example, Illinois barred any juvenile from being prosecuted as an adult going forward.  705 Ill. Comp. Stat. Ann. 405/5-120.  Some states extend the reasoning applicable to juveniles to young adults whose brains are still in development.  *See, e.g.*, Cal. Penal Code, §3051 (parole eligibility for offender younger than 25); Haw. Rev. Stat. §706-667 ("young adult defendants" under age of 22).

Some reforms provide all juveniles who have not committed homicide with parole eligibility after a certain number of years, regardless of how many offenses they have committed.  Ark. Code Ann. §16-93-621(a)(1) (20 years); Conn. Gen. Stat. Ann. §54-125a(f)(1) (30 years or less); Del. Code Ann. tit. 11, §4204A(d) (20 years); D.C. Code Ann. §24-403.03(a) (20 years through sentence modification); Fla. Stat. Ann. §921.1402(2)(d) (20 years); Nev. Rev. Stat. Ann. §213.12135 (15 years); W.Va. Code §61-11-23(b) (15 years, even for homicide); Wash. Rev. Code §9.94A.730(1) (20 years, unless convicted as sex offender).  Others were limited to discrete sentences for specific offenses.  La. Rev. Stat. §15:574.4(D)(1) (25 years for life sentence); Mo. Ann. Stat. §558.047(1) (between 30 and 40 years for life sentence); N.D. Cent. Code Ann. §12.1-32-13.1 (20 years regardless of how sentence is described).

Other reforms have focused on the penalty for murder in light of *Miller*.  All provide for parole consideration before 50 years if the offender was a juvenile at the time of the crime, but some allow a court to sentence incorrigible juveniles to life without parole.  Ariz. Rev. Stat. Ann. §§13-751, 13-752 (25 or 35 years, depending on age of victim); Ark. Code Ann. §§5-4-104, 5-10-101 (28 years); Mich. Comp. Laws Ann. §§769.25 (between 25 and 40 years with mandatory release after 60 years); Mo. Ann. Stat. §565.033 (between 30 and 40 years); Neb. Rev. Stat. Ann. §28-105.02 (40 years); N.C. Gen. Stat. Ann. §15A-

are differences in sentencing schemes of various jurisdictions that are not captured by the reference to a particular number of years concerning eligibility for parole, as jurisdictions have different ways of reducing that number with credit for good conduct and other factors. However, one thing is clear: precluding eligibility for parole for 50 years is not part of the legislative effort to comply with *Graham* and *Miller*.

- *Comparison to typical retirement age.* At least one court has used retirement age as a reference point.[44]

Another point of comparison has been provided by the Maryland General Assembly. Under Maryland Code, Criminal Law Article ("CR"), §14-101(c), an individual who has been convicted three times of a crime of violence and has served three separate terms of confinement with respect to those convictions, upon a fourth conviction, is to be sentenced to life without parole. However, once that individual has reached age 60 and served at least

---

1340.19A (25 years); Utah Code Ann. §76-3-206 (25 years); Vt. Stat. Ann. tit. 13, §§2303(a), 7045 (35 years for first-degree murder; 20 years for second-degree murder); *see also* Kallee Spooner & Michael S. Vaughn, *Sentencing Juvenile Homicide Offenders: A 50-State Survey*, 5 Va. J. Crim. L. 130 (2017) (collecting sentence ranges for juveniles convicted of murder).

Several states have chosen to eliminate life without parole entirely, and all of these states provide eligibility for parole before 50 years. Nev. Rev. Stat. Ann. §§176.025, 200.030, 213.12135 (20 years); Mass. Gen. Laws Ann. ch. 279, §24 (life with parole between 20 and 30 years); Wyo. Stat. Ann. §6-10-301(c) (25 years); Wash. Rev. Code Ann. §9.94A.510 (25 years); Or. Rev. Stat. Ann. §§161.620, 163.115(5)(b) (25 years).

[44] In *United States v. Grant*, 887 F.3d 131, 151 (3d Cir. 2018), the court required the sentencing court not only to conduct an individualized determination of life expectancy, but also to consider the "national age of retirement" with reference to various sources. The court reasoned that society has accepted retirement as a transitional stage of life. *Id.* at 150-52. *See also Cassiano v. Comm'r of Correction*, 115 A.3d 1031, 1046-47 (Conn. 2015) (comparing inmate's age at first opportunity for parole to definition of retirement age in Social Security Act).

15 years of the life-without-parole sentence, the individual may seek release on parole. CR §14-101(g). That provision applies to adult offenders, as well as juvenile offenders.

In considering any of these benchmarks, we must also keep in mind that the Supreme Court has equated the "meaningful opportunity for release based on demonstrated maturity and rehabilitation" with a "hope for some years of life outside prison walls." *Montgomery*, 136 S.Ct. at 737.

3.      *How* a Stacked Sentence Should be Considered

It may well be the case that a sentence denominated as a term of years that precludes eligibility for parole for lengthy period at some threshold level equates to a sentence of life without parole for purposes of applying *Graham* and *Miller*. But is that true when the lengthy term-of-years sentence is actually an aggregate sentence comprised of consecutive sentences imposed for multiple crimes – in a shorthand phrase, a stacked sentence? What difference, if any, does it make for purposes of the Eighth Amendment that the period of incarceration is the result of a stacked sentence, as opposed to a single sentence?

Whether a sentence, stacked or otherwise, is excessive under the Eighth Amendment "can never be litigated in the abstract but must be assessed on a case-by-case basis.… We measure proportionality not by comparing the sentence with the label of the crime (that the sentence be within legal limits is a legal problem, not a constitutional problem) but by comparing the sentence with the behavior of the criminal and the consequences of his act." *Thomas v. State*, 333 Md. 84, 97 (1993) (quoting *Walker v. State*, 53 Md. App. 171, 193 (1982)). Particularly with multiple offenses, the "criminal sentencing decision … involves

a plethora of considerations, both obvious and subtle," which makes it "illogical to conduct any review of a sentence using stringent and rigid standards." *Id.*

There may be any number of circumstances under which an inmate – adult or juvenile – comes to be serving consecutive sentences that add up to a lengthy term of incarceration. At one end of the spectrum, an individual may embark on a serious crime spree, involving, for example, a series of armed robberies or sexual assaults over weeks or months or even years. Whether the crimes are prosecuted together or separately, the courts may sentence the individual to significant periods of incarceration for each incident. These circumstances are least likely to warrant the aggregate sentence being treated as a *de facto* life sentence. The number of crimes, their seriousness, and the opportunity for the juvenile to reflect before each bad decision also makes it less likely that the aggregate sentence is constitutionally disproportionate even after taking youth and attendant characteristics into account.

At the other end of the spectrum is a situation where an individual is involved in one event or makes one bad decision that, for various reasons, may involve several separate crimes that do not merge into one another for sentencing purposes and for which consecutive sentences may be imposed. Here, the argument to treat a lengthy stacked sentence as if it were a *de facto* life sentence is strongest. There is little, if any, opportunity to reflect upon or abandon the underlying conduct between individual offenses. The initial decision should usually be treated the same as one to commit a single criminal offense carrying a sentence of life without parole. *See, e.g.*, *Budder v. Addison*, 851 F.3d at 1058 ("[States] may not take a single offense and slice it into multiple sub offenses in order to

avoid *Graham's* rule that juvenile offenders who do not commit homicide may not be sentenced to life without the possibility of parole."); *People v. Reyes*, 63 N.E.3d 884, 888 (Ill. 2016) (in light of *Miller*, vacating aggregate sentence of 97 years because juvenile "committed offenses in a single course of conduct").

Between those two extremes, one might imagine an extended crime spree of minor offenses or a series of closely-related events that result in multiple charges. Where a particular case lies on the spectrum depends on the same variety of considerations that apply at sentencing or during proportionality review. These include, but are not limited to, the relevant penological theory, the defendant's role and actions, whether the defendant appreciated the seriousness of his or her actions, and the consequences of the criminal behavior.

More than a century ago, the Supreme Court considered an Eighth Amendment challenge in a case that lay somewhere between the two ends of the spectrum. The defendant was a licensed New York liquor retailer who had been convicted of shipping liquor across the border to purchasers in Vermont on 307 occasions and had been sentenced by a Vermont court to 79 years incarceration for those offenses. *O'Neil v. Vermont*, 144 U.S. 323 (1892). Although the Supreme Court did not resolve the Eighth Amendment issue[45] – stating in passing that the Eighth Amendment did not apply to the states – and dismissed the case for lack of jurisdiction, it included in its opinion an oft-quoted passage

---

[45] The primary issue in the case appeared to be whether Vermont could punish the defendant for transactions that occurred partly in New York (where they were legal) and partly in Vermont (where they were not).

59

from the Vermont Supreme Court that sets forth the rationale for treating stacked sentences differently from a lengthy sentence for a single offense under the Eighth Amendment: "It would scarcely be competent for a person to assail the constitutionality of the statute prescribing a punishment for burglary, on the ground that he had committed so many burglaries that, if punishment for each were inflicted on him, he might be kept in prison for life." 144 U.S. at 330 (quoting the Vermont Supreme Court).[46]

Many courts have referred to the passage quoted in *O'Neil* in rejecting Eighth Amendment challenges to stacked sentences in cases prior to *Graham*.[47] However, some courts, including this Court, have recognized that there can be "extraordinary … circumstances [that] demonstrate that the cumulation of valid sentences for distinct offenses constitutes cruel and unusual punishment." *United States v. Golomb*, 811 F.2d 787, 791 (2d Cir. 1987) (internal quotations omitted); *Randall Book Corp. v. State*, 316 Md. 315, 331 (1989) (quoting *Golomb* on "extraordinary circumstances" justifying Eighth

---

[46] Interestingly, although the majority opinion in *O'Neil* did not address the Eighth Amendment issue (other than to observe that the amendment did not apply to the states), the three dissenting judges did consider the issue and would have held (1) perhaps presciently, that the Eighth Amendment does apply to the states via the Fourteenth Amendment and (2) that the sentence imposed in the case was cruel and unusual. 144 U.S. at 337-71. Indeed, Justice Field was fairly exercised on the point. 144 U.S. at 364 ("A convict is not to be scourged until the flesh fall from his body, and he die under the lash, though he may have committed a hundred offenses, for each of which, separately, a whipping of 20 stripes might be inflicted. An imprisonment at hard labor for a few days or weeks for a minor offense may be within the direction of a humane government; but, if minor offenses are numerous, no authority exists to convert the imprisonment into one of perpetual confinement at hard labor…").

[47] *See, e.g., Pearson v. Ramos*, 237 F.3d 881, 886 (7th Cir. 2001); *State v. August*, 589 N.W.2d 740, 744 (Iowa 1999).

Amendment review of consecutive sentences).[48]  This Court has recognized that some cases may warrant examining the total sentencing package rather than each count in isolation.  *Twigg v. State*, 447 Md. 1, 27 (2016) ("The notion of sentencing as a 'package' is well-recognized … among our sister federal and state appellate courts").  Although this Court has not yet identified such circumstances, the principle that "children are constitutionally different from adults for purposes of sentencing"[49] may justify inquiring if a sentencing package as a whole violates the Eighth Amendment.

And, indeed, that is what we find in the decisions of most other jurisdictions.  Most of the decisions in other jurisdictions applying *Graham* and *Miller* to sentences expressed in a term of years have actually involved stacked sentences.[50]  Only Louisiana and Missouri

---

[48] *See State v. Davis*, 79 P.3d 64, 74-75 (Ariz. 2003) ("Although this court normally will not consider the imposition of consecutive sentences in a proportionality inquiry, this case cries out for departure from that general rule"); *Close v. People*, 48 P.3d 528, 540 n.6 (Colo. 2002) ("Our holding that consecutive crime of violence statute sentences are not reviewable in the aggregate in a proportionality review does not preclude an Eighth Amendment challenge to that cumulative sentence under the 'shocks the conscience' standard").

Some courts have held that a state constitution's analog to the Eighth Amendment constrains consecutive sentences.  *State ex rel. Garvey v. Whitaker*, 19 So. 457, 459 (La. 1896) ("the severity and unusualness of the punishment which was inflicted upon relators is even more apparent … because the respondent found the relators guilty of 72 offenses within the space of 1 hour and 40 minutes, each offense embracing only 1 1/2 minutes, and one offense following after the other immediately and consecutively"); *State v. Stanislaw*, 65 A.3d 1242, 1250 (Me. 2013) ("When consecutive sentences are imposed, the sentencing court must make a determination that the unsuspended portion of any consecutive sentence is not excessive and is proportionate to the offense").

[49] *Miller*, 587 U.S. at 471.

[50] *United States v. Grant*, 887 F.3d. 131, 136 (3d Cir. 2018); *Kelly v. Brown*, 851 F.3d 686, 686-87 (7th Cir. 2017); *Moore v. Biter*, 725 F.3d 1184, 1186 (9th Cir. 2013);

---

have held *Graham* applies to sentences expressed in terms of years but not to aggregate sentences that are the result of multiple convictions.[51]  Although the majority of courts agree that aggregate sentences based on multiple convictions are subject to Eighth Amendment review pursuant to *Graham* and *Miller*, the analyses vary in terms of reasoning and emphasis.  Several states have applied *Graham* and *Miller* to stacked sentences under either a state constitution's analog to the Eighth Amendment or under an independent power to review sentences, avoiding the issue of relying solely on the Eighth Amendment

---

*Budder v. Addison*, 851 F.3d 1047, 1149 (10th Cir. 2017); *People v. Caballero*, 282 P.3d 291, 293 (Cal. 2012); *State v. Riley*, 110 A.3d 1205, 1206 (Conn. 2015), *cert. denied*, 136 S.Ct. 1361 (2016); *Johnson v. State*, 215 So. 3d 1237, 1239 (Fla. 2017); *People v. Reyes*, 63 N.E.3d 884, 886 (Ill. 2016); *Steilman v. Michael*, 407 P.3d 313, 319 (Mont. 2017); *State v. Boston*, 363 P.3d 453, 457 (Nev. 2015); *State v. Zuber*, 152 A.3d 197, 211 (N.J. 2017); *Ira v. Janecka*, 419 P.3d 161, 162 (N.M. 2018); *State v. Moore*, 76 N.E.3d 1127, 1130 (Ohio 2016); *Kinkel v. Persson*, 417 P.3d 401 (Or. 2018); *State v. Ramos*, 387 P.3d 650 (Wash. 2017); *Bear Cloud v. State*, 294 P.3d 36, 45 (Wyo. 2013).

Pennsylvania and South Dakota have considered multiple convictions in the context of sentences that have either merged with a life sentence or run concurrently with another, but we are unable to discern how this affected their analyses, if at all.

Those few states that apply *Graham* and *Miller* only to formal life sentences – and not to sentences expressed in a term of years – either do not consider this issue or perforce would not apply *Graham* in the case of a stacked sentence.  *E.g., State v. Kasic*, 265 P.3d 410 (Ariz. Ct. App. 2011); *Vasquez v. Commonwealth*, 781 S.E.2d 920 (Va. 2016).

The Supreme Court of Missouri has expressed the view that it needs guidance from the United States Supreme Court on this question.  *Willbanks v. Dep't of Corr.*, 522 S.W.3d 238, 245-46 (Mo. 2017) ("this Court, absent guidance from the Supreme Court, should not arbitrarily pick *the point* at which multiple aggregated sentences may become the functional equivalent of life without parole.").

[51] *Compare State v. Dyer*, 77 So.3d 928 (La. 2011) *with State v. Brown*, 118 So.3d 332, 339 (La. 2013); *Willbanks v. Dep't of Corr.*, 522 S.W.3d 238, 245-46 (Mo. 2017) *with State ex rel. Carr v. Wallace* 527 S.W. 3d 55 (Mo. 2017).

to the federal Constitution.[52] Commonly, however, courts highlight the difference between children and adults as discounting the relevance of whether the sentence is based on multiple convictions. As the Supreme Court of Ohio stated: "Whether the sentence is the product of a discrete offense or multiple offenses, the fact remains that it was a *juvenile* who committed the one offense or several offenses and who has diminished moral culpability." *State v. Moore*, 76 N.E.3d 1127, 1142 (Ohio 2017) (emphasis in original).

We thus disagree with the holding of the Court of Special Appeals that the Eighth Amendment analysis of *Graham* cannot apply to a sentence "that comprises multiple sentences imposed for multiple crimes against multiple victims, where no sentence individually is lengthy enough to trigger a *Graham*-based challenge." 233 Md. App. at 743. Rather, consideration must be given to where the stacked sentence falls on the spectrum as well as to the differences between adult and juvenile offenders. That is what we shall do in analyzing Mr. McCullough's case.

4. Application to Mr. McCullough's Case

Mr. McCullough was sentenced to a total of 100 years incarceration and will not be eligible for parole until he has served 50 years of that sentence. If it were a sentence for a

---

[52] *Brown v. State*, 10 N.E.3d 1, 7-8 (Ind. 2014) (applying *Miller* and *Graham* to 150 year aggregate sentence pursuant to state constitutional authority to review and revise sentences); *State v. Null*, 836 N.W.2d 41, 74-77 (Iowa 2013) ("[Constitution of Iowa] requires … recogniz[ing] and apply[ing] the core teachings of *Roper*, *Graham*, and *Miller* in making sentencing decisions for long prison terms involving juveniles … [and] consider[ing] whether the imposition of consecutive sentences would result in a prison term of such length that it [is] cruel and unusual punishment[.]"); *Commonwealth v. Perez*, 80 N.E.3d 967, 970 (Mass. 2017) (state constitution requires *Miller* hearing before imposing aggregate sentence exceeding what a juvenile would receive for murder).

single conviction, it would be treated as a sentence of life without parole for purposes of Eighth Amendment analysis under most of the benchmarks applied by the courts. The parole eligibility date far exceeds the parole eligibility date for a defendant sentenced to life in prison under Maryland law (15 years); it exceeds the threshold duration recognized by most courts in decisions and legislatures in reform legislation (significantly less than 50 years); and the eligibility date will be later than a typical retirement date for someone of Mr. McCullough's age.[53] Thus, under the criteria typically applied by the courts, Mr. McCullough's 100-year sentence would be regarded as equivalent to a sentence of life without parole – a sentence categorically precluded by the Eighth Amendment for a juvenile offender convicted of a non-homicide offense such as assault.[54]

---

[53] Mr. McCullough's parole eligibility is also beyond each potential retirement age discussed in *Grant*. 887 F.3d 131, 151-52 (3d Cir. 2018).

[54] Judge Watts' concurring and dissenting opinion would reach a different result in Mr. McCullough's case based on the premises that (1) other courts have referred to a defendant's life expectancy as a permissible period of a sentence without eligibility for parole and (2) Mr. McCullough's sentence allowed for parole within his life expectancy.

Neither premise is quite true. First, the courts that have referred to life expectancy have held that parole eligibility *beyond* a defendant's life expectancy is clearly a *de facto* sentence of life without parole; none of those courts has held that a sentence *equivalent* to the defendant's life expectancy would be permissible under *Graham*. See cases cited in footnote 37 above. This is likely because another way of describing life expectancy is as the likely date of one's death. Withholding *eligibility* for parole – not *release* on parole – until the likely date of the defendant's death is just another way of saying "life without parole" and is not consistent with a "hope for some years of life outside prison walls." *Montgomery*, 136 S.Ct. at 737.

Second, no determination of Mr. McCullough's life expectancy was made in the record of this case. Moreover, an attempt to calculate his individual life expectancy and key his parole eligibility date to that estimate raises a host of issues of practicality and fairness. See footnote 38 above.

Of course, Mr. McCullough's sentence did not result from a single assault conviction, but rather from the maximum sentences for four such convictions run consecutively.[55]  The circumstances of Mr. McCullough's stacked sentence, however, appear to be towards the lower end of the spectrum described in the previous section of this opinion.  All of his convictions related to a single incident on a single day.  Although the offenses were very serious in their execution and in their consequences and Mr. McCullough was characterized as the instigator of the incident, it appears that he was convicted as an aider and abettor of the offenses rather than as the principal.[56]  Under the

---

[55] Because he was sentenced to the maximum sentence on each count, Mr. McCullough was punished more harshly than nearly all adults convicted of the same offenses.  Although not necessarily prohibited by the constitution categorically, the Supreme Court has repeatedly disfavored that outcome generally. *Thompson v. Oklahoma*, 487 U.S. 815, 835 (1988) (plurality opinion) ("less culpability should attach to a crime committed by a juvenile than to a comparable crime committed by an adult.  The basis for this conclusion is too obvious to require extended explanation"); *Roper v. Simmons*, 543 U.S. 551, 570 (2005) ("From a moral standpoint it would be misguided to equate the failings of a minor with those of an adult"); *Miller*, 567 U.S. at 474 ("still worse, each juvenile … will receive the same sentence as the vast majority of adults committing similar homicide offenses").  As the Circuit Court itself noted, the maximum sentence was considerably above what the State's advisory sentencing guidelines provided for the offense.  *See* Maryland Code, Criminal Procedure Article, §§6-202, 6-211; COMAR 14.22.01 *et seq*.

[56] In defending a motion for judgment in the case, the prosecution told the Circuit Court that it was proceeding against Mr. McCullough under a theory of aiding and abetting the crimes charged.  Prosecutors often refer to aiding and abetting in passing in closing argument.  Here, however, aiding and abetting was the major theme of the prosecutor's closing argument. The prosecutor referred to the concept of aiding and abetting 22 times in his closing argument and told the jury repeatedly it could convict Mr. McCullough without finding that he had caused any of the victim's injuries or had even fired the gun.  The jury apparently accepted that theory and convicted Mr. McCullough only of the assault

analysis of the previous section of this opinion, we would thus consider Mr. McCullough's sentence no differently than a single sentence for purposes of *Graham*.

5.    Remand

Given our conclusion that the 100-year sentence imposed in his case violated the Eighth Amendment under the standard articulated in *Graham*, Mr. McCullough will have to be re-sentenced to a disposition that is not equivalent to life without parole. So long as the sentence is within the constraints set by the Eighth Amendment, the Circuit Court on remand has its usual broad discretion in selecting an appropriate sentence, taking into account the circumstances of the offenses, their impact on victims, Mr. McCullough's culpability, his status as a juvenile offender, the State's sentencing guidelines, and other factors typically considered by a sentencing court. *Jackson v. State*, 364 Md. 192, 199-200 (2001); *Jennings v. State*, 339 Md. 675, 684 (1995). The constraint imposed by the Eighth Amendment is that, while the sentence "is not required to guarantee eventual freedom," it must allow a "meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation" so that Mr. McCullough has "hope for some years of life outside the prison walls." In our view, that means a sentence with parole eligibility significantly short of the 50-year mark. By comparison, if Mr. McCullough had been convicted of four separate crimes of violence and been sentenced to life without parole under CR §14-101(c), he would become eligible to seek parole at age 60, after 43 years of confinement.

_____

charges and acquitted him of attempted murder and other counts related to use of a handgun.

66

Consistent with *Graham*, whatever sentence is imposed must allow such an opportunity for parole, but there is no guarantee or promise that Mr. McCullough will be released on parole then or ever.

In stating the reasons for whatever sentence is imposed, the court may wish to relate those reasons to the general objectives of criminal sentences. *See* Maryland Rule 4-342(f); *State v. Dopkowski*, 325 Md. 671, 679-81 (1992). An appellate court will vacate a sentence within statutory limits only if the defendant establishes that his or her sentence was unconstitutional or motivated by ill-will, prejudice or other impermissible considerations. *Abdul-Maleek v. State*, 426 Md. 59, 71 (2012) (internal citations and quotations omitted). A sentencing court is encouraged to explain its reasoning, however, because "justice is better served when a judge … freely and openly discloses the factors he weighed in arriving at the final sentencing disposition." *Johnson v. State*, 274 Md. 536, 544 (1975). It also helps an appellate court review whether the sentence is constitutionally proportionate. *Thomas v. State*, 333 Md. 84, 95-96 (1993).

## III

## Conclusion

For the reasons set forth above, we hold:

(1) The Maryland law governing parole, including the statutes, regulations, and executive order, provides a juvenile offender serving a life sentence with a "meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." Accordingly, the life sentences being served by Mr. Carter and Mr. Bowie do not inherently violate the Eighth Amendment and are not illegal for that reason. Whether the officials

involved in the parole system actually carry out their duties in accordance with the applicable laws is not before us.

(2) A sentence of 100 years, comprised of consecutive maximum sentences for assault convictions arising out of a single incident, under which a juvenile offender will not be eligible for parole consideration for 50 years is tantamount to a sentence of life without parole. Accordingly, the Eighth Amendment, as interpreted by the United States Supreme Court, precludes such a sentence and Mr. McCullough must be re-sentenced to a sentence that allows a "meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation."

**IN NO. 54, JUDGMENT OF THE COURT OF SPECIAL APPEALS VACATED AND CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO AFFIRM THE JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY. COSTS TO BE PAID BY PETITIONER.**

**IN NO. 55, JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS TO BE PAID BY PETITIONER.**

**IN NO. 56, JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED AND CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO REMAND THE CASE TO THE CIRCUIT COURT FOR BALTIMORE COUNTY FOR RE-SENTENCING CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY BALTIMORE COUNTY.**

68

Circuit Court for Baltimore City
Case No. 198265028

Circuit Court for Charles County
Case No. 08-K-96-000119

Circuit Court for Baltimore County
Case No. 03-K-04-001787

Argument: February 6, 2018

IN THE COURT OF APPEALS
OF MARYLAND

Nos. 54, 55, 56

September Term, 2017

DANIEL CARTER

v.

STATE OF MARYLAND

JAMES E. BOWIE

v.

STATE OF MARYLAND

MATTHEW TIMOTHY MCCULLOUGH

v.

STATE OF MARYLAND

Barbera, C.J.,
Greene
Adkins
McDonald
Watts
Hotten
Getty,

JJ.

Concurring and Dissenting Opinion by Barbera,
C.J., which Greene and Adkins, JJ., join.

Filed: August 29, 2018

I concur in part and dissent in part.

I agree with the Court's reasoning and holding in Mr. McCullough's case. Mr. McCullough was convicted in 2005 of four counts of first-degree assault stemming from "a single incident on a single day." Maj. Slip Op. at 65. Mr. McCullough, 17 years old at the time of the crime, was sentenced on each of the assault convictions to 25 years of incarceration, to be served consecutively; as a consequence, he has, in the aggregate, a 100-year sentence and is eligible for parole upon serving 50 years of that aggregate sentence.

The Majority poses the question of "whether a sentence stated as a term of years for a juvenile offender can ever be regarded as a sentence of life without parole for purposes of the Eighth Amendment" and answers that question in the affirmative:

> It seems a matter of common sense that the answer must be "yes." Otherwise, the Eighth Amendment proscription against cruel and unusual punishment in the context of a juvenile offender could be circumvented simply by stating the sentence in numerical terms that exceed any reasonable life expectancy rather than labeling it a "life" sentence.
>
> * * *
>
> This conclusion is supported not simply by common sense or by a straw poll of other courts. It is also consistent with the reasoning of *Graham* and *Miller*.

Maj. Slip Op. at 49–50. In further explanation of why the answer is "yes," the Majority concludes, and I agree, that in Mr. McCullough's case (and, I would think, other similarly situated juvenile offenders) the term of years sentence he received is "tantamount to a sentence of life without parole." Maj. Slip Op. at 68.

I fully embrace the Majority's reasoning and therefore join the outcome in Mr. McCullough's case. From there, however, my path and that of the Majority diverge. I dissent to the Majority's holdings in the cases of Mr. Carter and Mr. Bowie.

Much of the Majority's opinion is to be admired. The opinion includes a well-crafted description of Maryland's statutory and regulatory parole scheme and the relevant case law, including not only the U.S. Supreme Court's Eighth Amendment decisions on the subject but also the relevant case law from Maryland, many of our sister states, and federal district and circuit courts. The Majority likewise devotes much ink, appropriately so, to the Executive Order issued by Governor Hogan several days after the Court heard oral argument in the three cases that are the subject of this opinion.[1] I have no quarrel with either the Majority's description of Maryland's current parole system and pertinent case law or, for that matter, much of the legal analysis that follows.

My quarrel is with the holding of Section II, Part 3 that the Governor's 2018 Executive Order together with the Maryland Parole Commission's ("Commission") regulation concerning parole for juvenile offenders, COMAR 12.08.01.18A(3), make an otherwise unconstitutional Maryland parole system compliant with the dictates of the Eighth Amendment. Maj. Slip Op. at 43–47. Although the Majority reads the Supreme Court's cases correctly, it applies those cases to Maryland's process in an aspirational rather than a realistic manner.

The clear directive that emerges from *Graham v. Florida*, 560 U.S. 48 (2010), *Miller v. Alabama*, 567 U.S. 460 (2012), and *Montgomery v. Louisiana*, 136 S. Ct. 718

---

[1] As the majority notes, Maj. Slip Op. at 1 n.3, we heard argument on the same day in a fourth case, *State v. Clements*, __ Md. __, No. 57 (Sept. Term 2017) (2018). We held in that case that an order granting a motion to correct an illegal sentence, without a new sentence yet imposed, is not appealable by the State. We therefore affirmed the judgment of the Court of Special Appeals dismissing the appeal.

(2016), is that juvenile offenders must be afforded a "meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." *Graham*, 560 U.S. at 75; *Miller*, 567 U.S. at 479; *Montgomery*, 136 S. Ct. at 736. Maryland's current parole scheme, when viewed in light of the Commission's regulation and the Executive Order, calls for consideration of a number of factors. But mere consideration of those factors falls short of the federal constitutional benchmark. If "demonstrated maturity and rehabilitation" is a factor only to be "considered" rather than a necessary and sufficient condition of release, then the Commission remains free, in the exercise of unfettered discretion, to decline even to forward a recommendation of parole to the Governor. Further, were the Governor to receive a recommendation in favor of parole for a juvenile offender serving a life sentence, there remains in the Executive Order the Governor's exercise of discretion to deny parole notwithstanding that, by the terms of the Executive Order, the Governor "shall consider" certain additional factors.[2] Although the Executive Order certainly goes some distance in

---

[2] The 2018 Executive Order states that, regarding parole decisions for an inmate serving a life sentence, "the Governor shall assess and consider . . . the same factors and information assessed by the Maryland Parole Commission as provided by the Maryland Parole Commission's governing statutes and regulations," as well as "other lawful factors deemed relevant by the Governor." *Codified at* COMAR 01.01.2018.06A. With respect to juvenile offenders serving life sentences, the Executive Order provides that the Governor "shall" additionally consider the provisions of COMAR 01.01.2018.06C(1):

  i. The juvenile offender's age at the time the crime was committed and the lesser culpability of juvenile offenders as compared to adult offenders;

  ii. The degree to which the juvenile offender has demonstrated maturity since the commission of the crime; and

  iii. The degree to which the juvenile offender has demonstrated rehabilitation since the commission of the crime.

3

the direction of complying with the Supreme Court's decisions in *Graham*, *Miller*, and *Montgomery*, it falls short of achieving that goal.

The Majority correctly concludes that in light of *Graham*, *Miller*, and *Montgomery*, the statute describing eligibility for parole—§ 7-301 of the Correctional Services Article ("CS")—is on its face unconstitutional as applied to juvenile offenders. Maj. Slip Op. at 41. CS § 7-301 does not distinguish between juvenile and adult offenders and therefore violates *Graham* and its progeny. The Majority decides, however, that the Executive Order, which I agree has the force of law, bridges the gap between CS § 7-301 and what, under the *Graham*, *Miller*, and *Montgomery* trilogy, is required by the Eighth Amendment to the United States Constitution. Maj. Slip Op. at 47.

I am not persuaded that either the Executive Order or COMAR 12.08.01.18A(3),[3]

---

[3] When determining whether a juvenile offender is suitable for parole, the Commission currently "considers" the following factors:

(a) Age at the time the crime was committed;

(b) The individual's level of maturity and sense of responsibility at the time of [*sic*] the crime was committed;

(c) Whether influence or pressure from other individuals contributed to the commission of the crime;

(d) Whether the prisoner's character developed since the time of the crime in a manner that indicates the prisoner will comply with the conditions of release;

(e) The home environment and family relationships at the time the crime was committed;

(f) The individual's educational background and achievement at the time the crime was committed; and

or the two authorities together, cures the constitutional infirmity of Maryland's current parole system. I come to that conclusion because neither the Executive Order nor the regulation includes any sort of standard to guide the exercise of discretion, much less a standard that satisfies the Eighth Amendment.

The Majority's analysis is flawed for the same reason that Maryland's parole system is unconstitutional: both purport to "consider" the guidance of the Supreme Court without ascribing any weight to specific factors or indicating in which direction those factors militate. The Majority relies on the laudable intent of the Executive Order and the Commission's regulation rather than on their respective texts. Neither the regulation nor the Executive Order, however, sufficiently cabins the discretion that the Commission and the Governor each wield, so as to render constitutional that which currently is not.

The Commission's regulation, COMAR 12.08.01.18A(3), as noted by the Majority, was promulgated in response to *Graham* and its progeny. Maj. Slip Op. at 18 n.14. In the absence of standards that guide the Commissioners' exercise of discretion, the regulation leaves them free to "consider" the listed factors but then to accord little or no relative weight to one or more of them in deciding whether a juvenile offender is "suitable" for parole. The regulation also does not specify in which direction—either in support of or against parole—the listed factors should militate. In the absence of any standard for exercising discretion, a Commissioner has no guidance on how to assess and weigh, for

---

(g) Other factors or circumstances unique to prisoners who committed crimes at the time the individual was a juvenile that the Commissioner determines to be relevant.

5

example, the factor described as "home environment and family relationships at the time," COMAR 12.08.01.18A(3)(e). Is that factor intended to cut in favor of or against parole, and how much weight should it receive in relation to the other factors? Nothing in the regulation hints at the answer. Without standards that sufficiently guide the exercise of discretion, whether by the Commission or the Governor, our current system renders the possibility of parole an empty promise for juvenile offenders serving life sentences.

I close with this: One might imagine that, were he with us to speak on the subject today, Thomas Aquinas, whose quoted words stand at the outset of the Majority's opinion, likely would conclude that the result reached by the Majority is neither just nor merciful. Maj. Slip Op. at 1 & n.1. It is neither just nor merciful, much less compliant with the Eighth Amendment, that, currently in Maryland, a young teenager who commits a crime that leads to a life sentence is likely to spend the rest of his or her life in prison. And it is not justice to have on the books the "possibility of parole" yet provide a protocol for granting or denying parole that is without standards to guide those who are the decision makers: the Parole Commission and the Governor. Under the United States Constitution, a meaningful opportunity for release cannot exist in name only, as it now does in Maryland. I would therefore reverse the judgments of the Court of Special Appeals in Mr. Carter's and Mr. Bowie's cases.

Judge Greene and Judge Adkins have authorized me to state that they join this opinion.

Circuit Court for Baltimore City
Case No. 198265028

Circuit Court for Charles County
Case No. 08-K-96-000119

Circuit Court for Baltimore County
Case No. 03-K-04-001787

Argued: February 6, 2018

IN THE COURT OF APPEALS

OF MARYLAND

Nos. 54, 55, and 56

September Term, 2017
_____

DANIEL CARTER

v.

STATE OF MARYLAND
_____

JAMES E. BOWIE

v.

STATE OF MARYLAND
_____

MATTHEW TIMOTHY MCCULLOUGH

v.

STATE OF MARYLAND
_____

Barbera, C.J.
Greene
Adkins
McDonald
Watts
Hotten
Getty,

JJ.
_____

Concurring and Dissenting Opinion by Watts,
J., which Getty, J., joins.
_____

Filed: August 29, 2018

Respectfully, I concur with the majority opinion as to Carter and Bowie, but I dissent as to McCullough. I agree with the Majority's conclusion that "a lengthy term-of-years sentence can be a life sentence for purposes of the Eighth Amendment." Maj. Slip Op. at 51. I disagree, however, with the Majority's reasoning that McCullough's sentence was the equivalent of a life sentence. See id. at 63-64. I would affirm the Court of Special Appeals's judgment, and I would adopt the Honorable Deborah Sweet Eyler's sound logic that McCullough's sentence was not the equivalent of a life sentence because the age at which he will become eligible for parole (67) is within his life expectancy. See McCullough v. State, 233 Md. App. 702, 744, 168 A.3d 1045, 1069 (2017).

As the Majority explains, the very reason why a sentence of a term of years can be the equivalent of a life sentence is that, "[o]therwise, the Eighth Amendment proscription against cruel and unusual punishment in the context of a juvenile offender could be circumvented simply by stating the sentence in numerical terms that exceed **any reasonable life expectancy** rather than labeling it a 'life' sentence." Maj. Slip Op. at 49 (emphasis added). Thus, multiple of our fellow State Supreme Courts, as well as multiple federal appellate courts, have used a defendant's life expectancy as a benchmark to determine whether a sentence of a term of years is the equivalent of a life sentence. For example, in State v. Moore, 76 N.E.3d 1127, 1128-29 (Ohio 2017), the Supreme Court of Ohio held that "a term-of-years prison sentence that exceeds a defendant's **life expectancy** violates the Eighth Amendment [] when it is imposed on a juvenile nonhomicide offender." (Emphasis added). In State ex rel. Morgan v. State, 217 So. 3d 266, 271-73 (La. 2016), the Supreme Court of Louisiana held that a sentence of a term of years was the equivalent

of a life sentence, and noted that the State of Louisiana "ha[d] not pointed to a single case in which a juvenile convicted of just one nonhomicide offense was sentenced to a single term of years exceeding his **life expectancy**." (Emphasis added). In People v. Caballero, 282 P.3d 291, 295 (Cal. 2012), the Supreme Court of California held that "sentencing a juvenile offender for a nonhomicide offense to a term of years with a parole eligibility date that falls outside the juvenile offender's **natural life expectancy** constitutes cruel and unusual punishment in violation of the Eighth Amendment." (Emphasis added). In Henry v. State, 175 So. 3d 675, 679 (Fla. 2015), the Supreme Court of Florida held that the Eighth Amendment "requires a juvenile nonhomicide offender . . . to be afforded" a "meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation . . . during his or her **natural life**." (Cleaned up) (emphasis added). Later, in another case, that Court held that "juvenile nonhomicide offenders are entitled to sentences that provide a meaningful opportunity for early release based on demonstrated maturity and rehabilitation during their **natural lifetimes**[.]" Johnson v. State, 215 So.3d 1237, 1239 (Fla. 2017) (emphasis added). In Moore v. Biter, 725 F.3d 1184, 1191 (9th Cir. 2013), the Ninth Circuit held that a defendant's sentence of 254 years of imprisonment was "materially indistinguishable from a life sentence without parole because [he would] not be eligible for parole within his **lifetime**." (Emphasis added). In Budder v. Addison, 851 F.3d 1047, 1057 (10th Cir.), the Tenth Circuit held that the Eighth Amendment bars "any sentence that denies a juvenile nonhomicide offender a realistic opportunity to obtain release in his or her **lifetime**[.]" (Emphasis added). In State v. Boston, 363 P.3d 453, 459 (Nev. 2015), as modified (Jan. 6, 2016), the Supreme Court of Nevada held that a defendant's sentence did

not violate the Eighth Amendment because a statute provided him with "a meaningful opportunity for [him] to obtain release within his **lifetime**." (Emphasis added). And, in United States v. Mathurin, 868 F.3d 921, 932 (11th Cir. 2017), the Eleventh Circuit stated: "For purposes of this appeal, we will assume that [the Eighth Amendment] does apply to a non-parolable term-of-years sentence that extends beyond a defendant's **expected life span**." (Emphasis added).

As Judge Eyler aptly observed, almost all of these cases "dealt with . . . periods of parole ineligibility that plainly exceeded the defendant's life expectancy." McCullough, 233 Md. App. at 744, 168 A.3d at 1069 (citations omitted). To contrast the age at which those defendants would become eligible for parole with the age at which McCullough will, I provide the following chart:



See Mathurin, 868 F.3d at 933; Johnson, 215 So.3d at 1242; Moore, 76 N.E.3d at 1133; Henry, 175 So. 3d at 679-80; Morgan, 217 So. 3d at 274; Boston, 363 P.3d at 454;

Caballero, 282 P.3d at 293; Moore, 725 F.3d at 1186; Budder, 851 F.3d at 1049.

As the above chart shows, Mathurin, 868 F.3d at 933, is the only one of these cases in which the defendant would become eligible for parole at a younger age (57) than McCullough will (67). In Mathurin, id. at 935-36, the Eleventh Circuit held that the defendant's sentence complied with the Eighth Amendment because he would be eligible for release "over five years before the end of his own projected life span and almost ten years before the date projected for all males his age." Similarly, here, the Court of Special Appeals held that McCullough's sentence was permissible because he would be eligible for parole within "his average life expectancy." McCullough, 233 Md. App. at 744, 168 A.3d at 1069. I agree with the holding of the Court of Special Appeals.[1]

Despite the existence of the many above-discussed cases in which courts have used a defendant's life expectancy as a benchmark, the Majority does not do so. See Maj. Slip Op. at 63-66. Instead, the Majority reasons that McCullough's sentence is the equivalent of a life sentence "under most of the benchmarks applied by the courts." Id. at 63-64. The Majority uses three benchmarks other than McCullough's life expectancy: "a typical retirement date for someone of [his] age"; the fifteen years of imprisonment that a defendant with a life sentence must serve to be eligible for parole; and "the threshold duration recognized by most courts in decision and legislatures in reform legislation

---

[1]In other words, courts have use a defendant's life expectancy as a benchmark for determining whether a sentence is the equivalent of a sentence of life without parole. A sentence exceeding a defendant's life expectancy has been held to be the equivalent of a sentence of life without parole. On the other hand, a sentence in which a defendant becomes eligible for parole within his or her life expectancy would not be the equivalent of a sentence of life without parole.

(significantly less than 50 years)[.]" Id. at 64. In my view, none of these standards justifies deviating from the weight of State and federal authority, which favors using a defendant's life expectancy as the yardstick.

The Majority discusses only one case in which a "court has used retirement age as a reference point." Id. at 56 & n.44 (footnote omitted). That case is United States v. Grant, 887 F.3d 131, 150 (3d Cir. 2018), in which the Third Circuit held that, "to effectuate the Eighth Amendment's requirement of meaningful opportunity for release, a juvenile offender [who] is found to be capable of reform should presumptively be afforded an opportunity for release at some point before the age of retirement." (Citation omitted). The Third Circuit cautioned that it was "adopt[ing] only a rebuttable presumption that a non-incorrigible juvenile offender should be afforded an opportunity for release before the national age of retirement, not a hard and fast rule." Id. at 152. And, critically, the Third Circuit emphasized that "lower courts must consider the age of retirement as a sentencing factor, **in addition to life expectancy**[.]" Id. at 151 (emphasis added) (emphasis omitted). In other words, the Third Circuit endorsed considering the typical age of retirement in addition to—not as a substitute for—the defendant's life expectancy. See id. Thus, even if this Court were to adopt Grant—which I would not, given that it appears to be the only case in which a court has considered the age of retirement—this Court would still need to consider McCullough's life expectancy. Contrary to the practice that the Third Circuit espoused in Grant, in its analysis, the Majority considers the typical age of retirement, but fails to consider McCullough's life expectancy. See Maj. Slip Op. at 63-66.

I am wholly unpersuaded by the Majority's reasoning that McCullough's "parole

eligibility date far exceeds the parole eligibility date for a defendant sentenced to life in prison under Maryland law (15 years)[.]" Id. at 64. The Majority cites only two cases in which "courts have compared the eligibility date for parole under a lengthy term-of-years sentence to the parole eligibility date for an offender sentenced to life in prison or for a murder conviction in the particular jurisdiction[.]" Id. at 53 & n.39. One of those cases is Moore, 76 N.E.3d at 1128-29, in which, as noted above, the Supreme Court of Ohio used "a defendant's life expectancy" as a benchmark. The Majority quotes the following statement in Moore, id. at 1140:

> *Graham*[ *v. Florida*, 560 U.S. 48 (2010)] cannot stand for the proposition that juveniles who do not commit homicide must serve longer terms in prison than the vast majority of juveniles who commit murder, who, because of *Miller*[ *v. Alabama*, 567 U.S. 460 (2012)], are all but assured the opportunity to demonstrate maturity and rehabilitation at a meaningful point in their sentences.

Maj. Slip Op. at 53 n.39. This statement in Moore, 76 N.E.3d at 1140, does not support the proposition that the Supreme Court of Ohio used the parole eligibility date for a defendant with a life sentence as a benchmark. To the contrary, that Court held that the sentence in Moore violated the Eighth Amendment because the defendant would not be eligible for release until he was 92, which was beyond his life expectancy. See id. at 1149, 1133. Thus, Moore does not support the Majority's use of 15 years of imprisonment as a yardstick.

Nor does the other case that the Majority cites, Commonwealth v. Perez, 80 N.E.3d 967, 970 (Mass. 2017), in which the Supreme Judicial Court of Massachusetts held that,

> where a juvenile is sentenced for a nonmurder offense or offenses and the aggregate time to be served prior to parole eligibility exceeds that applicable

to a juvenile convicted of murder, the sentence cannot be reconciled with art. 26 [of the Massachusetts Declaration of Rights] unless, after a hearing on the factors articulated in *Miller*[], the judge makes a finding that the circumstances warrant treating the juvenile more harshly for parole purposes than a juvenile convicted of murder.

Critically, the Supreme Judicial Court of Massachusetts expressly based its holding not on the Eighth Amendment, but instead on the Massachusetts Declaration of Rights, which that Court "ha[d] interpreted more broadly than the Supreme Court has interpreted the Eighth Amendment." Perez, 80 N.E.3d at 970 (footnote omitted). Thus, Perez is unpersuasive where, as here, the Eighth Amendment is at issue.

Finally, I find no merit in the Majority's reasoning that McCullough's parole eligibility date "exceeds the threshold duration recognized by most courts in decision and legislatures in reform legislation (significantly less than 50 years)[.]" Maj. Slip Op. at 64. With regard to case law, the Majority states: "Many courts have concluded that a sentence to a term of years that precludes parole consideration for a half century is equivalent to a sentence of life without parole." Id. at 53 (footnote omitted). And, with regard to statutes, the Majority states: "[S]ome courts have looked to how various [S]tate legislatures have amended laws governing sentencing and parole to comply with the Supreme Court's recent decisions concerning the Eighth Amendment and sentencing of juvenile offenders." Id. at 55 (footnote omitted). The Majority quotes the following language in People v. Contreras, 411 P.3d 445 (Cal. 2018): "In enacting [] sentencing reforms, [S]tate legislatures observed that sentencing juvenile nonhomicide offenders to 50 or more years of incarceration without parole eligibility is not consistent with *Graham*." (Citations omitted). See Maj. Slip Op. at 55 n.42. According to the Majority, "precluding eligibility for parole for 50

- 7 -

years is not part of the legislative effort to comply with *Graham* and *Miller*." Id. at 56. To support this proposition, the Majority cites various other States' statutes, under which the length of imprisonment that a defendant must serve to be eligible for parole varies from 15 years to 40 years. See id. at 55-56 n.43.

I take issue with the Majority's reasoning in several respects. First, although other States' legislatures have purported to codify Graham and Miller, the General Assembly has not. I see no reason to consider statutes that have no force in Maryland. Additionally, it is up to courts, not legislatures, to interpret and apply the Eighth Amendment. Although legislatures can attempt to do so, the ultimate responsibility rests with courts. I would not abdicate our role as interpreters of the Constitution by relying on statutes, as opposed to case law, while analyzing the Eighth Amendment. Furthermore, as demonstrated by the wide gap in various other States' statutes (ranging from 15 years to 40 years), the amount of time that a defendant must serve before becoming eligible for parole is a matter of an individual State's legislative choice. The Majority conjures up a standard based on these statutes by stating that all of them involve time periods that are "significantly less than 50 years[.]" Maj. Slip Op. at 64. The Majority then applies that standard by remanding to the circuit court with instructions to impose a sentence that will allow McCullough the opportunity to be released "significantly short of the 50-year mark." Id. at 66. The Majority does not explain why it does not set the bar at 50 years, as certain other courts have done, but rather mandates that McCullough's sentence be reduced to a sentence that allows parole eligibility at a point significantly less than 50 years. See id. at 53-54, 66.

I would not adopt the 50-year bar that some other courts have used, and I certainly

- 8 -

would not utilize the significantly less than 50 years standard that the Majority gins up. Both of these standards (50 years and "significantly short of the 50-year mark") would tie the hands of sentencing courts, which need to be able to fashion sentences that take into account the circumstances of the crimes, the defendant's characteristics, the need to protect the community, and the goals of rehabilitation and deterrence.

As to the circumstances of the crime, the Majority attempts to downplay the seriousness of McCullough's convictions by observing that they "related to a single incident on a single day[,]" and that he was apparently convicted as an aider and abettor, as opposed to a principal. Id. at 65. These circumstances do not justify the Majority's conclusion that McCullough's sentence violates the Eighth Amendment. The question is not how blameworthy McCullough's crimes were; the question is whether his sentence is the equivalent of a life sentence. I would answer that question in the negative by applying the benchmark that several other State Supreme Courts, federal appellate courts, and the Court of Special Appeals have utilized—namely, whether a defendant will become eligible for parole within his or her life expectancy. The Court of Special Appeals determined that life expectancy was the appropriate benchmark and that the 100-year aggregate sentence was not cruel and unusual punishment. See McCullough, 233 Md. App. at 744, 168 A.3d at 1069. As explained by the Court of Special Appeals, McCullough "tacitly acknowledges[ that] age 67[, the age when he becomes parole eligible,] is less than his average life expectancy." Id. at 744, 168 A.3d at 1069. On brief in this Court, McCullough acknowledges that he would be 67 years old when he becomes parole eligible. With the Court of Special Appeals utilizing the benchmark of life expectancy, McCullough does not

contend that becoming parole eligible at age 67 exceeds the life expectancy benchmark, *i.e.*, he does not quarrel with the premise that age 67 is within his average life expectancy.[2]

I would conclude that McCullough's sentence is not the equivalent of a life sentence and does not violate the Eighth Amendment.

For the above reasons, respectfully, I concur as to <u>Carter</u> and <u>Bowie</u>, and I dissent as to <u>McCullough</u>.

Judge Getty has authorized me to state that he joins in this opinion.

---

[2]The circumstance that there is no determination of McCullough's actual life expectancy in the record of this case does not make untrue the premise that the age at which McCullough will become eligible for parole (67) is within his life expectancy. A principled position might be that the lack of a determination of McCullough's actual life expectancy renders unknown the determination of whether the age of 67 is within his life expectancy. But, in this instance, with the knowledge that the Court of Special Appeals observed that McCullough had "tacitly acknowledge[d that] age 67 is less than his average life expectancy[,]" <u>McCullough</u>, 233 Md. App. at 744, 168 A.3d at 1069, and that he has not asserted before this Court that age 67 exceeds his life expectancy, the conclusion that the age of 67 is within McCullough's life expectancy is warranted.